IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re matter of | ) | CHAPTER 7 |
| | ) | |
| RICHARD RYAN DEMPSEY and | ) | NO. 08 B 33951 |
| EILEEN M. DEMPSEY, | ) | |
| | ) | |
| Debtors, | ) | JUDGE JACQUELINE P. COX |
| | ) | |
| _____ ) | | |
| GEORGE J. MCCARTHY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. _____ |
| | ) | |
| RICHARD M. DEMPSEY, | ) | |
| | ) | |
| Defendant. | ) | |

**ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY
OF DEBT UNDER 11 U.S.C. § 727(a) and 11 U.S.C. § 523(a)(18)**

NOW COMES the Plaintiff, GEORGE J. MCCARTHY (George McCarthy),
through Messer & Stilp, Ltd., a Professional Corporation, and petitions the Court,
pursuant to 11 U.S.C. § 727(a) to have the Debtors', RICHARD RYAN DEMPSEY
("Richard Dempsey") and EILEEN M. DEMPSEY ("Eileen Dempsey")(collectively, the
"Debtors") discharge denied entirely, and pursuant to 11 U.S.C. § 523(a)(18) for the
limited purpose of determining that the debt owed to George McCarthy is
nondischargeable. In support thereof, George McCarthy states as follows:

1.      This adversary proceeding arises out of the Defendants' Chapter 7 Case
No. 08 B 33951.

**Parties**

2.      Richard Dempsey and Eileen Dempsey are individuals that reside at 2626

North Lakeview, Chicago, Illinois.

3.      George McCarthy is an individual that resides in Greenville, South Carolina.

### Jurisdiction and Venue

4.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

5.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### COUNT I - 11 U.S.C. § 727(a)

NOW COMES George McCarthy, through Messer & Stilp, Ltd., a Professional Corporation, and petitions the Court, pursuant to 11 U.S.C. § 727(a) to have the Debtors', Richard Dempsey and Eileen Dempsey, discharge denied entirely.  In support thereof, George McCarthy states as follows:

1-5.    George McCarthy realleges and incorporates by reference Paragraphs 1-5.

6.      Richard Dempsey and Eileen Dempsey filed a verified Statement of Financial Affairs.  See Attached Exhibit A.

7.      In that Statement, Richard Dempsey and Eileen Dempsey affirmed that they received no income from employment or from the operation of business in the two years immediately preceding the filing the bankruptcy petition.  Exhibit A, No. 1.

8.      Richard Dempsey and Eileen Dempsey further stated under oath that their only income in the two years preceding the bankruptcy filing was from social security and from oil royalties totaling approximately $17,000.00 per year.  Exhibit A, No. 2.

9.      Richard Dempsey and Eileen Dempsey filed Schedule I – Current Income of Individual Debtor(s).  See Attached Exhibit B.

10.     Richard Dempsey and Eileen Dempsey declared under penalties of perjury that their average monthly income was $1,355.00. Exhibit B, No. 16.

11.     George McCarthy was granted leave to examine Richard Dempsey and Eileen Dempsey pursuant to Federal Rule of Bankruptcy Procedure 2004.

12.     The 2004 examinations of Richard Dempsey and Eileen Dempsey were taken on May 7, 2009.

**Debtors failed to disclose earning $750,000.00 or more in the last two years.**

13.     Richard Dempsey is, and at all relevant times has been, the sole owner of all shares of Demhoff Corporation. He is also a director and officer of the entity.

14.     Demhoff Corporation is an Illinois corporation that Richard Dempsey used to trade millions of dollars in the commodities market, and used to hold assets such as real estate, autos and other property.

15.     During the 2004 examination, Richard Dempsey admitted that he personally received between $200,000.00 and $300,000.00 from Demhoff Corporation in 2008. See 2004 Examination transcript of Richard Dempsey dated May 7, 2009 and attached hereto as Exhibit C, pages 9-10.

16.     Richard Dempsey admitted that he personally received between $100,000.00 and $150,000.00 from Demhoff in 2007. Exhibit C, page 11.

17.     Richard Dempsey admitted that he personally received between $100,000.00 and $150,000.00 from Demhoff in 2006. Exhibit C, page 12.

18.     Richard Dempsey further admitted that Eileen Dempsey received at least $50,000.00 per year from Demhoff Corporation from 2006 through the date of the bankruptcy filing. Exhibit C, page 12-14.

19.   Between 2006 and 2008, the Debtors admitted that they personally received between $550,000.00 and $750,000.00 from Demhoff Corporation as income and for payment of personal expenses.

20.   Despite earning on average at least $250,000.00 per year, the Debtors represented under penalties of perjury that they were only making approximately $17,000.00 per year from 2006 to present.  Exhibit B, No. 16.

21.   The debtors confirmed that the money received from Demhoff Corporation was deposited into their personal accounts.

22.   The debtors admitted that they are receiving income from Demhoff Corporation even after the bankruptcy filing including the receipt of $23,780.59 in January 2009.  Exhibit C, page 32.

23.   Despite receiving up to $750,000.00 in the last two years (and on information and belief the amounts received by the debtors exceeds this amount), none of this income was reported on the Statement of Financial Affairs or on Schedules I and J of the Debtors' bankruptcy filings.

24.   Richard Dempsey and Eileen Dempsey falsely and fraudulently stated that they are only making $1,355.00 a month in income and that they received no income from any source other than social security or oil royalties in the last two years.

**Debtors failed to disclose the transfer of a 50% ownership interest in Linda Lou's**

25.   Richard Dempsey represented on the Statement of Financial Affairs that no transfers of assets were made in the last two years.  Exhibit A, No. 10.

26.   Richard Dempsey admitted that at the 2004 Examination that this statement was false.

4

27.    Richard Dempsey transferred his 50% common stock ownership interest in Linda Lou's 119, Inc. in December 2007. Exhibit C, page 21.

28.    According to Richard Dempsey, the shares in Linda Lou's 199, Inc. were exchanged in return for the elimination in $40,000.00 in debt. Exhibit C, page 22.

29.    The transfer of the Linda Lou's 199, Inc. shares was not disclosed on the Statement of Financial Affairs.

**Debtors failed to disclose the sale of $2,000,000.00 by Demhoff Corporation and their personal receipt of the proceeds.**

30.    On or about December 2, 2006 Demhoff sold its interest in real estate in Woodford County, Illinois for $2,000,000.00. See attached Exhibit D. The property sold is legally described as:

NW ¼ & W ½ SW SECTION 10, PARTRIDGE TOWNSHIP, WOODFORD COUNTY, ILLINOIS.

31.    As part of the sale, Demhoff retained six membership interests in the purchaser valued at $923,078.00. The entity purchasing the land was The Greenhead Hunting Club, LLC.

32.    On information and belief, money received at closing was deposited into Demhoff Corporation accounts. Richard Dempsey then withdrew the amounts obtained for his personal use.

33.    Three of the six membership interests in The Greenhead Hunting Club, LLC were sold for $153,000.00 in 2007. Exhibit C, page 74-75.

34.    Money from one of the membership sales was deposited into Richard Dempsey's personal account. Exhibit C, page 76.

35.    On information and belief, the remaining money from the membership

sales were deposited into Demhoff Corporation accounts and then personally withdrawn by Richard Dempsey as income for his personal use.

36.    None of the amounts received by Richard Dempsey from Demhoff Corporation were reported in any of his bankruptcy filings.

**Debtors fraudulently represented that the value of their interest in Demhoff Corporation was $0, when they were still withdrawing substantial money from that corporation immediately before and after filing for bankruptcy.**

37.    Richard Dempsey and Eileen Dempsey reported that Demhoff Corporation was valued as $0 on Schedule C of bankruptcy filing.  A copy of that Schedule is attached hereto as Exhibit E.

38.    Demhoff Corporation had value because there was money in its bank accounts, as evidenced by Richard Dempsey's withdrawal of over $23,000.00 in January 2009, and by the fact that Richard Dempsey and Eileen Dempsey continued to earn money through Demhoff Corporation before siphoning money from the corporate accounts to their personal accounts.  Exhibit C, page 32.

39.    Demhoff continues to own membership interest in The Greenhead Hunting Club, LLC.  Each interest is worth $153,000.00

40.    None of their personal dealings with Demhoff Corporation was reported in the bankruptcy filings.

41.    Richard Dempsey failed to truthfully answer Number 18 of the Statement of Financial Affairs because the value of Demhoff Corporation is above $0.

**Richard Dempsey failed to disclose he is the sole Manager of The Greenhead Hunting Club, LLC.**

42.    Richard Dempsey admitted at the 2004 Examination that he is the sole Manager of The Greenhead Hunting Club, LLC.  Exhibit C, page 79.

43.   The fact that Richard Dempsey was the sole Manager of an entity that purchased $2,000,000.00 in real estate was not disclosed on the Statement of Financial Affairs.

### Richard Dempsey overstated his liabilities.

44.   Richard Dempsey represented that he is owed $1,225,000.00 from Chillicothe.

45.   The $1,225,000.00 owed by Chillicothe is in fact loans owed to George McCarthy's pension plan by Chillicothe, not Richard Dempsey.

46.   Richard Dempsey and Eileen Dempsey overstated their liabilities by $1,225,000.00.

47.   Richard Dempsey and Eileen Dempsey had knowledge that they received $750,000.00 in income from Demhoff Corporation and failed to disclose this information to this Court.

48.   Richard Dempsey and Eileen Dempsey had knowledge that there were assets transferred within two years of the bankruptcy filing and that they intended not to disclose these transfers to this Court.

49.   Richard Dempsey and Eileen Dempsey knew that Richard Dempsey was a Manager of The Greenhead Hunting Club, LLC and that Richard Dempsey overstated his liabilities.

50.   All of the transactions described in Paragraphs 6-46 were material because they bear a direct relationship to the bankrupts' business transactions and estate.

51.   Richard Dempsey and Eileen Dempsey engaged in a pattern of fraud and deceipt to hide income, assets and other transactions that were material to this case.

52.   Richard Dempsey and Eileen Dempsey grossly understated their income and assets, and overstated their liabilities in this case with full knowledge of their conduct.

53.   The schedules and pleadings filed by Richard Dempsey and Eileen Dempsey were made with a reckless disregard to the truth and were intentionally false.

54.   Each of the Schedules, Statements and Disclosures contained in Debtors' Petition were verified under § 1008 of the Federal Rules of Bankruptcy Procedure.

55.   11 U.S.C. § 727(a)(2)(A) prohibits a discharge if a debtor concealed property within one year of the filing of the petition for bankruptcy.

56.   11 U.S.C. § 727(a)(4)(A) prohibits a discharge is a debtor fraudulently and knowingly makes a false oath.

57.   11 U.S.C. § 727(a)(4)(B) prohibits a discharge is a debtor presents a false claim.

58.   11 U.S.C. § 727(a)(5) prohibits a discharge is a debtor fails to adequately explain the loss of assets or deficiency of assets to pay debts.

59.   Richard Dempsey and Eileen Dempsey violated 11 U.S.C. § 727(a)(2)(A) by concealing property and assets as above described.

60.   Richard Dempsey and Eileen Dempsey violated 11 U.S.C. § 727(a)(4)(A) by making false oaths as above described.

61.   Richard Dempsey and Eileen Dempsey violated 11 U.S.C. § 727(a)(4)(B) by presenting false claims as above described.

62.   Richard Dempsey and Eileen Dempsey violated 11 U.S.C. § 727(a)(5) by failing to explain the loss of assets or deficiency of assets to meet the Debtors' liabilities

as above described.

WHEREFORE, George McCarthy respectfully request that this Honorable Court hold that the discharge of Richard Dempsey and Eileen Dempsey be denied in its entirety pursuant to 11 U.S.C. § 727(a), and for any other relief this Court deems proper.

## COUNT II - 11 U.S.C. § 523(a)(18)

NOW COMES George McCarthy, through Messer & Stilp, Ltd., a Professional Corporation, and petitions the Court, pursuant to 11 U.S.C. § 523(a)(18) for the limited purpose of determining that the debt owed to George McCarthy is nondischargeable.  In support thereof, George McCarthy states as follows:

63-67.  George McCarthy realleges and incorporates by reference Paragraphs 1-5.

68.     Chillicothe Construction Company, Inc ("Chillicothe"). is an Illinois corporation doing business throughout the State of Illinois and is located at 2626 North Lakeview, Chicago, Illinois.

69.     Richard Dempsey is a 55% owner in Chillicothe Construction Company, Inc.  Exhibit E.

70.     Richard Dempsey was at all relevant times, the president, treasurer and secretary of Chillicothe and had absolute control over the transactions of that entity.

71.     Richard Dempsey a commodities trader, created Chillicothe for the sole purpose of providing an additional commodity trading entity.

72.     At all relevant times George McCarthy was the sole owner of the Khalsa Corporation Profit Sharing Plan.

73.    In the late 1980s Eileen Dempsey approached George McCarthy and recommended that he loan his pension money with her husband Richard Dempsey so that Richard Dempsey could trade the money in the commodities market.

74.    Relying on Eileen Dempsey's advice George McCarthy met with Richard Dempsey to discuss the investment of George McCarthy's pension money.

75.    Richard Dempsey advised and represented to George McCarthy that he had experience and expertise in commodities trading and that any trading would have to be done through Chillicothe.

76.    Relying on his representations, George McCarthy agreed to loan his pension money to allow Richard Dempsey to trade the funds in the commodities market.

### August 12, 1990 Pension Note

77.    On or about August 12, 1990 George McCarthy and Chillicothe for valuable consideration entered into an agreement whereby George McCarthy would loan Chillicothe $50,000.00 from the Khalsa Corporation Profit Sharing Plan.  See attached Exhibit F.

78.    George McCarthy and Chillicothe agreed that Chillicothe would repay the principal plus interest in an amount equal to 10% per annum to the Khalsa Corporation Profit Sharing Plan on August 12, 1995.  See attached Exhibit F.

79.    George McCarthy and Chillicothe agreed for valuable consideration to renew the note for an additional five-year term with interest continuing at 10% per annum.  See attached Exhibit G.

### August 24, 1990 Pension Note

80.    On or about August 24, 1990 George McCarthy and Chillicothe for

valuable consideration entered into an agreement whereby George McCarthy would loan Chillicothe $50,000.00 from the Khalsa Corporation Profit Sharing Plan. See attached Exhibit H.

81.     George McCarthy and Chillicothe agreed that Chillicothe would repay the principal plus interest in an amount equal to 10% per annum to the Khalsa Corporation Profit Sharing Plan on August 24, 1995. See attached Exhibit H.

82.     George McCarthy and Chillicothe agreed for valuable consideration to renew the note for an additional five-year term with interest continuing at 10% per annum. See attached Exhibit I.

### December 18, 1990 Pension Note

83.     On or about December 18, 1990 George McCarthy and Chillicothe for valuable consideration entered into an agreement whereby George McCarthy would loan Chillicothe $100,000.00 from the Khalsa Corporation Profit Sharing Plan. See attached Exhibit J.

84.     George McCarthy and Chillicothe agreed that the Chillicothe would repay the principal plus interest in an amount equal to 10% per annum to the Khalsa Corporation Profit Sharing Plan on December 18, 1995. See attached Exhibit J.

85.     George McCarthy and Chillicothe agreed for valuable consideration to renew the note for an additional five-year term with interest continuing at 10% per annum. See attached Exhibit K.

### January 2, 1991 Pension Note

86.     On or about January 2, 1991 George McCarthy and Chillicothe for valuable consideration entered into an agreement whereby George McCarthy would loan

Chillicothe $125,000.00 from the Khalsa Corporation Profit Sharing Plan. See attached Exhibit L.

87.     George McCarthy and Chillicothe agreed that Chillicothe would repay the principal plus interest in an amount equal to 10% per annum to the Khalsa Corporation Profit Sharing Plan on January 2, 1996. See attached Exhibit L.

88.     George McCarthy and Chillicothe agreed for valuable consideration to renew the note for an additional five-year term with interest continuing at 10% per annum. See attached Exhibit M.

### March 1, 1991 Pension Note

89.     On or about March 1, 1991 George McCarthy and Chillicothe for valuable consideration entered into an agreement whereby George McCarthy would loan Chillicothe $500,000.00 from the Khalsa Corporation Profit Sharing Plan. See attached Exhibit N.

90.     George McCarthy and Chillicothe agreed that Chillicothe would repay the principal plus interest in an amount equal to 10% per annum to the Khalsa Corporation Profit Sharing Plan on March 1, 1996. See attached Exhibit N.

91.     George McCarthy and Chillicothe agreed for valuable consideration to renew the note for an additional five-year term with interest continuing at 10% per annum. See attached Exhibit O.

### May 15, 1992 Pension Note

92.     On or about May 15, 1992 George McCarthy and Chillicothe for valuable consideration entered into an agreement whereby George McCarthy would loan Chillicothe $400,000.00 from the Khalsa Corporation Profit Sharing Plan. See attached

Exhibit P.

93.    George McCarthy and Chillicothe agreed that Chillicothe would repay the principal plus interest in an amount equal to 10% per annum to the Khalsa Corporation Profit Sharing Plan on May 15, 1997. See attached Exhibit P.

94.    George McCarthy and Chillicothe agreed for valuable consideration to renew the note for an additional five-year term with interest continuing at 10% per annum. See attached Exhibit Q.

95.    Chillicothe promised to repay all principle and interest on the promissory notes on the respective maturity dates as described above.

96.    George McCarthy on his part has performed all of the conditions of the agreement by him to be performed.

97.    Chillicothe has breached the agreement because it has failed to pay any amounts owed to the Khalsa Corporation Profit Sharing Plan owned by George McCarthy or any part thereof.

98.    Richard Dempsey, using Chillicothe as his alter-ego, never traded the money loan from George McCarthy's pension in the commodities market despite representing that he would.

99.    Richard Dempsey informed George McCarthy that Chillicothe was insolvent and "judgment-proof."

100.    Richard Dempsey rendered Chillicothe incapable of performing its contractual obligations to George McCarthy by causing a transfer of all or substantially all of its assets to other entities that Richard Dempsey personally had an interest in.

101.   Richard Dempsey failed to adequately capitalize Chillicothe to the detriment of George McCarthy.

102.   Chillicothe was a mere façade for the operation of commodity trading on behalf of Richard Dempsey.

103.   Richard Dempsey has failed to maintain an arm's length relationship between Chillicothe and other entities owned by Richard Dempsey.

104.   Money was transferred by Richard Dempsey to Lakeside Corporation of Mount Dora, Inc immediately after George McCarthy's pension money was loaned to Chillicothe.

105.   In 2000 Richard Dempsey received in excess of $1,900,000.00 from Lakeside Corporation of Mount Dora, Inc., and retained the money for his own personal benefit, and failed to reimburse Chillicothe or George McCarthy.

106.   Chillicothe was Richard Dempsey's alter ego.

107.   George McCarthy was not notified of the asset transfers from Chillicothe.

108.   That at all times relevant hereto, George McCarthy was relying on the integrity and credit worthiness of Richard Dempsey and not of Chillicothe when entering into the promissory notes for his pension funds.

109.   George McCarthy filed suit in the Circuit Court of DuPage County, Illinois to collect his pension money. That case was styled *George J. McCarthy v. Chillicothe Construction Company, Inc., an Illinois Corporation, Richard Dempsey, Lakeside Corporation of Mount Dora, Inc., a Florida corporation, Eileen M. Dempsey and Demhoff Corp., Respondent in Discovery*, as DuPage County Circuit Court No. 00 L 933.

110.    Richard Dempsey was represented by counsel from when the case was filed to when it went to trial.

111.    Trial started on January 11, 2008 and Richard Dempsey was present with his counsel.

112.    On January 11, 2008 an order was entered awarding judgment in the amount of $2,500,000.00 against Chillicothe and Richard Dempsey.  See attached Exhibit R.

113.    Judgment was entered against Richard Dempsey personally after piercing the corporate veil of Chillicothe.

114.    The judgment entered against Richard Dempsey was for his failure to repay George McCarthy's pension money.

115.    Acknowledging the judgment, Richard Dempsey signed the judgment order and waived any right to appeal.  Exhibit R.

116.    Richard Dempsey signed the judgment order with full knowledge of rights and after full participation in his defense.

117.    During the 2004 Examination, Richard Dempsey admitted the money owed was for George McCarthy's pension.  Exhibit C, page 58.

118.    George McCarthy is listed as a Creditor holding an unsecured nonpriority claim in the amount of $2,579,004.11 on Schedule F.

119.    The money owed to George McCarthy is money owed to his pension.

WHEREFORE, George McCarthy respectfully request that this Honorable Court hold that for the limited purpose the debt owed to George McCarthy is nondischargeable pursuant to 11 U.S.C. § 523(a)(18), and for any other relief this Court deems proper.

Respectfully submitted,

GEORGE J. MCCARTHY

By:    /s/ Thomas R. Stilp

Thomas R. Stilp ( #06198439)
John N. Bielski II (#6242527)
Messer & Stilp, Ltd.
166 W. Washington, Suite 300
Chicago, IL 60602
(312) 334-3445
(312) 334-3434 (Fax)
bielski@messerstilp.com
stilp@messerstilp.com

B7 (Official Form 7) (12/07)

# United States Bankruptcy Court
## Northern District of Illinois

In re    **Richard Ryan Dempsey**
     **Eileen M. Dempsey**
                                                 Debtor(s)

Case No. _____
Chapter    **7**

## STATEMENT OF FINANCIAL AFFAIRS

This statement is to be completed by every debtor. Spouses filing a joint petition may file a single statement on which the information for both spouses is combined. If the case is filed under chapter 12 or chapter 13, a married debtor must furnish information for both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. An individual debtor engaged in business as a sole proprietor, partner, family farmer, or self-employed professional, should provide the information requested on this statement concerning all such activities as well as the individual's personal affairs. To indicate payments, transfers and the like to minor children, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. § 112; Fed. R. Bankr. P. 1007(m).

Questions 1 - 18 are to be completed by all debtors. Debtors that are or have been in business, as defined below, also must complete Questions 19 - 25. **If the answer to an applicable question is "None," mark the box labeled "None."** If additional space is needed for the answer to any question, use and attach a separate sheet properly identified with the case name, case number (if known), and the number of the question.

### DEFINITIONS

*"In business."* A debtor is "in business" for the purpose of this form if the debtor is a corporation or partnership. An individual debtor is "in business" for the purpose of this form if the debtor is or has been, within six years immediately preceding the filing of this bankruptcy case, any of the following: an officer, director, managing executive, or owner of 5 percent or more of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or self-employed full-time or part-time. An individual debtor also may be "in business" for the purpose of this form if the debtor engages in a trade, business, or other activity, other than as an employee, to supplement income from the debtor's primary employment.

*"Insider."* The term "insider" includes but is not limited to: relatives of the debtor; general partners of the debtor and their relatives; corporations of which the debtor is an officer, director, or person in control; officers, directors, and any owner of 5 percent or more of the voting or equity securities of a corporate debtor and their relatives; affiliates of the debtor and insiders of such affiliates; any managing agent of the debtor. 11 U.S.C. § 101.

---

**1. Income from employment or operation of business**

None
☒
State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business, including part-time activities either as an employee or in independent trade or business, from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the **two years** immediately preceding this calendar year. (A debtor that maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income. Identify the beginning and ending dates of the debtor's fiscal year.) If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

      AMOUNT               SOURCE

**2. Income other than from employment or operation of business**

None
☐
State the amount of income received by the debtor other than from employment, trade, profession, or operation of the debtor's business during the **two years** immediately preceding the commencement of this case. Give particulars. If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income for each spouse whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| AMOUNT | SOURCE |
| --- | --- |
| **$15,336.00** | **Social security 2006** |
| **$15,840.00** | **Social security 2007** |

EXHIBIT
A

Blumberg No. 5119

2

| AMOUNT | SOURCE |
|---|---|
| **$13,805.00** | **Social security 2008 YTD** |
| **$1,207.00** | **2006 Oil royalties** |
| **$1,207.00** | **2007 oil royalties** |
| **$1,100.00** | **2008 oil royalties YTD** |

**3. Payments to creditors**

None
☒

*Complete a. or b., as appropriate, and c.*

a.    *Individual or joint debtor(s) with primarily consumer debts.* List all payments on loans, installment purchases of goods or services, and other debts to any creditor made within **90 days** immediately preceding the commencement of this case unless the aggregate value of all property that constitutes or is affected by such transfer is less than $600. Indicate with an (*) any payments that were made to a creditor on account of a domestic support obligation or as part of an alternative repayment schedule under a plan by an approved nonprofit budgeting and creditor counseling agency. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|

None
☒

b.    *Debtor whose debts are not primarily consumer debts:* List each payment or other transfer to any creditor made within **90 days** immediately preceding the commencement of the case unless the aggregate value of all property that constitutes or is affected by such transfer is less than $5,475. If the debtor is an individual, indicate with an asterisk (*) any payments that were made to a creditor on account of a domestic support obligation or as part of an alternative repayment schedule under a plan by an approved nonprofit budgeting and creditor counseling agency. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS/ TRANSFERS | AMOUNT PAID OR VALUE OF TRANSFERS | AMOUNT STILL OWING |
|---|---|---|---|

None
☒

c.    *All debtors:* List all payments made within **one year** immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR AND RELATIONSHIP TO DEBTOR | DATE OF PAYMENT | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|

**4. Suits and administrative proceedings, executions, garnishments and attachments**

None
☐

a. List all suits and administrative proceedings to which the debtor is or was a party within **one year** immediately preceding the filing of this bankruptcy case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| CAPTION OF SUIT AND CASE NUMBER | NATURE OF PROCEEDING | COURT OR AGENCY AND LOCATION | STATUS OR DISPOSITION |
|---|---|---|---|
| **McCarthy v. Richard Dempsey and Chilicothe Construction Company, Case No. 00 L 933** | **Contract dispute** | **Circuit Court of DuPage County** | **Judgment for $2,579,004.** |
| **Citibank v. Eileen M. Dempsey, 07 M1 206029** | **Collection on credit card** | **Circuit Court of Cook County** | **Recently filed** |
| **American Express v. Richard Dempsey, 07 M1 160648** | **Collection on credit card** | **Circuit Court of Cook County** | **Default order entered.** |

3

None
☒
 b. Describe all property that has been attached, garnished or seized under any legal or equitable process within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF PERSON FOR WHOSE BENEFIT PROPERTY WAS SEIZED | DATE OF SEIZURE | DESCRIPTION AND VALUE OF PROPERTY |
| --- | --- | --- |

### 5. Repossessions, foreclosures and returns

None
☒
 List all property that has been repossessed by a creditor, sold at a foreclosure sale, transferred through a deed in lieu of foreclosure or returned to the seller, within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR OR SELLER | DATE OF REPOSSESSION, FORECLOSURE SALE, TRANSFER OR RETURN | DESCRIPTION AND VALUE OF PROPERTY |
| --- | --- | --- |

### 6. Assignments and receiverships

None
☒
 a. Describe any assignment of property for the benefit of creditors made within **120 days** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include any assignment by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF ASSIGNEE | DATE OF ASSIGNMENT | TERMS OF ASSIGNMENT OR SETTLEMENT |
| --- | --- | --- |

None
☒
 b. List all property which has been in the hands of a custodian, receiver, or court-appointed official within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CUSTODIAN | NAME AND LOCATION OF COURT CASE TITLE & NUMBER | DATE OF ORDER | DESCRIPTION AND VALUE OF PROPERTY |
| --- | --- | --- | --- |

### 7. Gifts

None
☒
 List all gifts or charitable contributions made within **one year** immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient. (Married debtors filing under chapter 12 or chapter 13 must include gifts or contributions by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF PERSON OR ORGANIZATION | RELATIONSHIP TO DEBTOR, IF ANY | DATE OF GIFT | DESCRIPTION AND VALUE OF GIFT |
| --- | --- | --- | --- |

### 8. Losses

None
☒
 List all losses from fire, theft, other casualty or gambling within **one year** immediately preceding the commencement of this case **or since the commencement of this case.** (Married debtors filing under chapter 12 or chapter 13 must include losses by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| DESCRIPTION AND VALUE OF PROPERTY | DESCRIPTION OF CIRCUMSTANCES AND, IF LOSS WAS COVERED IN WHOLE OR IN PART BY INSURANCE, GIVE PARTICULARS | DATE OF LOSS |
| --- | --- | --- |

4

**9. Payments related to debt counseling or bankruptcy**

None
☐

List all payments made or property transferred by or on behalf of the debtor to any persons, including attorneys, for consultation concerning debt consolidation, relief under the bankruptcy law or preparation of the petition in bankruptcy within **one year** immediately preceding the commencement of this case.

| NAME AND ADDRESS OF PAYEE | DATE OF PAYMENT, NAME OF PAYOR IF OTHER THAN DEBTOR | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|
| **Forrest L. Ingram**<br>**79 W. Monroe St.**<br>**Suite 900**<br>**Chicago, IL 60603** | **November 21, 2008** | **$5001 plus filing fee $299** |

**10. Other transfers**

None
☒

a. List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **two years** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF TRANSFEREE, RELATIONSHIP TO DEBTOR | DATE | DESCRIBE PROPERTY TRANSFERRED AND VALUE RECEIVED |
|---|---|---|

None
☒

b. List all property transferred by the debtor within **ten years** immediately preceding the commencement of this case to a self-settled trust or similar device of which the debtor is a beneficiary.

| NAME OF TRUST OR OTHER DEVICE | DATE(S) OF TRANSFER(S) | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY OR DEBTOR'S INTEREST IN PROPERTY |
|---|---|---|

**11. Closed financial accounts**

None
☐

List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within **one year** immediately preceding the commencement of this case. Include checking, savings, or other financial accounts, certificates of deposit, or other instruments; shares and share accounts held in banks, credit unions, pension funds, cooperatives, associations, brokerage houses and other financial institutions. (Married debtors filing under chapter 12 or chapter 13 must include information concerning accounts or instruments held by or for either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF INSTITUTION | TYPE OF ACCOUNT, LAST FOUR DIGITS OF ACCOUNT NUMBER, AND AMOUNT OF FINAL BALANCE | AMOUNT AND DATE OF SALE OR CLOSING |
|---|---|---|
| **LaSalle Bank N.A.**<br>**135 South LaSalle Street**<br>**Chicago, IL 60603** | **Checking acct. no. 5306531988 (Now: Bank of America)**<br>**Bal. $20.62** | **October 2008.** |
| **LaSalle Bank N.A.**<br>**135 South LaSalle Street**<br>**Chicago, IL 60603** | **Checking acct. no. 5306719906 (now Bank of America)**<br>**$26.00** | **October 2008** |

5

**12. Safe deposit boxes**

None
☐

List each safe deposit or other box or depository in which the debtor has or had securities, cash, or other valuables within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include boxes or depositories of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF BANK OR OTHER DEPOSITORY | NAMES AND ADDRESSES OF THOSE WITH ACCESS TO BOX OR DEPOSITORY | DESCRIPTION OF CONTENTS | DATE OF TRANSFER OR SURRENDER, IF ANY |
|---|---|---|---|
| **Harris Bank, Hinsdale Hinsdale, IL 60521** | **Richard and Eileen Dempsey** | **Old boat titles and old boat trailer titles (all equipment was scrapped).** | |

**13. Setoffs**

None
☒

List all setoffs made by any creditor, including a bank, against a debt or deposit of the debtor within **90 days** preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATE OF SETOFF | AMOUNT OF SETOFF |
|---|---|---|

**14. Property held for another person**

None
☒

List all property owned by another person that the debtor holds or controls.

| NAME AND ADDRESS OF OWNER | DESCRIPTION AND VALUE OF PROPERTY | LOCATION OF PROPERTY |
|---|---|---|

**15. Prior address of debtor**

None
☒

If the debtor has moved within **three years** immediately preceding the commencement of this case, list all premises which the debtor occupied during that period and vacated prior to the commencement of this case. If a joint petition is filed, report also any separate address of either spouse.

| ADDRESS | NAME USED | DATES OF OCCUPANCY |
|---|---|---|

**16. Spouses and Former Spouses**

None
☒

If the debtor resides or resided in a community property state, commonwealth, or territory (including Alaska, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, or Wisconsin) within **eight years** immediately preceding the commencement of the case, identify the name of the debtor's spouse and of any former spouse who resides or resided with the debtor in the community property state.

NAME

**17. Environmental Information.**

For the purpose of this question, the following definitions apply:

"Environmental Law" means any federal, state, or local statute or regulation regulating pollution, contamination, releases of hazardous or toxic substances, wastes or material into the air, land, soil, surface water, groundwater, or other medium, including, but not limited to, statutes or regulations regulating the cleanup of these substances, wastes, or material.

"Site" means any location, facility, or property as defined under any Environmental Law, whether or not presently or formerly owned or operated by the debtor, including, but not limited to, disposal sites.

"Hazardous Material" means anything defined as a hazardous waste, hazardous substance, toxic substance, hazardous material, pollutant, or contaminant or similar term under an Environmental Law

6

None
■    a. List the name and address of every site for which the debtor has received notice in writing by a governmental unit that it may be liable or potentially liable under or in violation of an Environmental Law. Indicate the governmental unit, the date of the notice, and, if known, the Environmental Law:

| SITE NAME AND ADDRESS | NAME AND ADDRESS OF GOVERNMENTAL UNIT | DATE OF NOTICE | ENVIRONMENTAL LAW |
|---|---|---|---|

None
■    b. List the name and address of every site for which the debtor provided notice to a governmental unit of a release of Hazardous Material. Indicate the governmental unit to which the notice was sent and the date of the notice.

| SITE NAME AND ADDRESS | NAME AND ADDRESS OF GOVERNMENTAL UNIT | DATE OF NOTICE | ENVIRONMENTAL LAW |
|---|---|---|---|

None
■    c. List all judicial or administrative proceedings, including settlements or orders, under any Environmental Law with respect to which the debtor is or was a party. Indicate the name and address of the governmental unit that is or was a party to the proceeding, and the docket number.

| NAME AND ADDRESS OF GOVERNMENTAL UNIT | DOCKET NUMBER | STATUS OR DISPOSITION |
|---|---|---|

**18 . Nature, location and name of business**

None
☐    a. *If the debtor is an individual*, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time within **six years** immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within **six years** immediately preceding the commencement of this case.

*If the debtor is a partnership*, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities, within **six years** immediately preceding the commencement of this case.

*If the debtor is a corporation*, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities within **six years** immediately preceding the commencement of this case.

| NAME | LAST FOUR DIGITS OF SOCIAL-SECURITY OR OTHER INDIVIDUAL TAXPAYER-I.D. NO. (ITIN)/ COMPLETE EIN | ADDRESS | NATURE OF BUSINESS | BEGINNING AND ENDING DATES |
|---|---|---|---|---|
| **Chillicothe Construction Co.** | | **2626 N. Lakeview Ave. Apt. 1303 Chicago, IL 60614** | **Construction** | **1967-1988 (not operating but still in existence)** |
| **Linda Lou's 119, Inc.** | 37-1379541 | **119 N. Washington St. Lacon, IL 61540** | **Bar and restaurant** | **1/1999 to presnet (Debtor no longer employed after 4/2007)** |
| **Demhoff Corporation** | 36-2680635 | **2626 N. Lakeview, Apt. 1303 Chicago, IL 60614** | **Investment** | **10/1969 to present. Debtor is a director and officer.** |

None
■    b. Identify any business listed in response to subdivision a., above, that is "single asset real estate" as defined in 11 U.S.C. § 101.

| NAME | ADDRESS |
|---|---|

The following questions are to be completed by every debtor that is a corporation or partnership and by any individual debtor who is or has been, within **six years** immediately preceding the commencement of this case, any of the following: an officer, director, managing executive, or

7

owner of more than 5 percent of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership, a sole proprietor or self-employed in a trade, profession, or other activity, either full- or part-time.

*(An individual or joint debtor should complete this portion of the statement **only** if the debtor is or has been in business, as defined above, within six years immediately preceding the commencement of this case. A debtor who has not been in business within those six years should go directly to the signature page.)*

### 19. Books, records and financial statements

None ☒

a. List all bookkeepers and accountants who within **two years** immediately preceding the filing of this bankruptcy case kept or supervised the keeping of books of account and records of the debtor.

| NAME AND ADDRESS | DATES SERVICES RENDERED |
|---|---|

None ☒

b. List all firms or individuals who within the **two years** immediately preceding the filing of this bankruptcy case have audited the books of account and records, or prepared a financial statement of the debtor.

| NAME | ADDRESS | DATES SERVICES RENDERED |
|---|---|---|

None ☐

c. List all firms or individuals who at the time of the commencement of this case were in possession of the books of account and records of the debtor. If any of the books of account and records are not available, explain.

| NAME | ADDRESS |
|---|---|
| **Debtor** | |

None ☒

d. List all financial institutions, creditors and other parties, including mercantile and trade agencies, to whom a financial statement was issued by the debtor within **two years** immediately preceding the commencement of this case.

| NAME AND ADDRESS | DATE ISSUED |
|---|---|

### 20. Inventories

None ☒

a. List the dates of the last two inventories taken of your property, the name of the person who supervised the taking of each inventory, and the dollar amount and basis of each inventory.

| DATE OF INVENTORY | INVENTORY SUPERVISOR | DOLLAR AMOUNT OF INVENTORY (Specify cost, market or other basis) |
|---|---|---|

None ☒

b. List the name and address of the person having possession of the records of each of the two inventories reported in a., above.

| DATE OF INVENTORY | NAME AND ADDRESSES OF CUSTODIAN OF INVENTORY RECORDS |
|---|---|

### 21 . Current Partners, Officers, Directors and Shareholders

None ☒

a. If the debtor is a partnership, list the nature and percentage of partnership interest of each member of the partnership.

| NAME AND ADDRESS | NATURE OF INTEREST | PERCENTAGE OF INTEREST |
|---|---|---|

None ☒

b. If the debtor is a corporation, list all officers and directors of the corporation, and each stockholder who directly or indirectly owns, controls, or holds 5 percent or more of the voting or equity securities of the corporation.

| NAME AND ADDRESS | TITLE | NATURE AND PERCENTAGE OF STOCK OWNERSHIP |
|---|---|---|

8

**22 . Former partners, officers, directors and shareholders**

None ▣   a. If the debtor is a partnership, list each member who withdrew from the partnership within **one year** immediately preceding the commencement of this case.

NAME                           ADDRESS                           DATE OF WITHDRAWAL

None ▣   b. If the debtor is a corporation, list all officers, or directors whose relationship with the corporation terminated within **one year** immediately preceding the commencement of this case.

NAME AND ADDRESS                     TITLE                     DATE OF TERMINATION

**23 . Withdrawals from a partnership or distributions by a corporation**

None ▣   If the debtor is a partnership or corporation, list all withdrawals or distributions credited or given to an insider, including compensation in any form, bonuses, loans, stock redemptions, options exercised and any other perquisite during **one year** immediately preceding the commencement of this case.

| NAME & ADDRESS OF RECIPIENT, RELATIONSHIP TO DEBTOR | DATE AND PURPOSE OF WITHDRAWAL | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
| --- | --- | --- |

**24. Tax Consolidation Group.**

None ▣   If the debtor is a corporation, list the name and federal taxpayer identification number of the parent corporation of any consolidated group for tax purposes of which the debtor has been a member at any time within **six years** immediately preceding the commencement of the case.

NAME OF PARENT CORPORATION                     TAXPAYER IDENTIFICATION NUMBER (EIN)

**25. Pension Funds.**

None ▣   If the debtor is not an individual, list the name and federal taxpayer identification number of any pension fund to which the debtor, as an employer, has been responsible for contributing at any time within **six years** immediately preceding the commencement of the case.

NAME OF PENSION FUND                     TAXPAYER IDENTIFICATION NUMBER (EIN)

## DECLARATION UNDER PENALTY OF PERJURY BY INDIVIDUAL DEBTOR

I declare under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct.

Date **December 11, 2008**          Signature  **/s/ Richard Ryan Dempsey**
                                                   **Richard Ryan Dempsey**
                                                   Debtor

Date **December 11, 2008**          Signature  **/s/ Eileen M. Dempsey**
                                                   **Eileen M. Dempsey**
                                                   Joint Debtor

*Penalty for making a false statement: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571*

B6I (Official Form 6I) (12/07)

In re   **Richard Ryan Dempsey**
**Eileen M. Dempsey**                                                    Case No. _____
_____
Debtor(s)

## SCHEDULE I - CURRENT INCOME OF INDIVIDUAL DEBTOR(S)

The column labeled "Spouse" must be completed in all cases filed by joint debtors and by every married debtor, whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. Do not state the name of any minor child. The average monthly income calculated on this form may differ from the current monthly income calculated on Form 22A, 22B, or 22C.

| Debtor's Marital Status: | DEPENDENTS OF DEBTOR AND SPOUSE | |
|---|---|---|
| **Married** | RELATIONSHIP(S): **None.** | AGE(S): |

| Employment: | DEBTOR | SPOUSE |
|---|---|---|
| Occupation | **Retired** | |
| Name of Employer | | |
| How long employed | | |
| Address of Employer | | |

INCOME: (Estimate of average or projected monthly income at time case filed)

| | DEBTOR | SPOUSE |
|---|---|---|
| 1. Monthly gross wages, salary, and commissions (Prorate if not paid monthly) | $ 0.00 | $ 0.00 |
| 2. Estimate monthly overtime | $ 0.00 | $ 0.00 |
| 3. SUBTOTAL | $ 0.00 | $ 0.00 |
| 4. LESS PAYROLL DEDUCTIONS | | |
| a. Payroll taxes and social security | $ 0.00 | $ 0.00 |
| b. Insurance | $ 0.00 | $ 0.00 |
| c. Union dues | $ 0.00 | $ 0.00 |
| d. Other (Specify): | $ 0.00 | $ 0.00 |
| | $ 0.00 | $ 0.00 |
| 5. SUBTOTAL OF PAYROLL DEDUCTIONS | $ 0.00 | $ 0.00 |
| 6. TOTAL NET MONTHLY TAKE HOME PAY | $ 0.00 | $ 0.00 |
| 7. Regular income from operation of business or profession or farm (Attach detailed statement) | $ 0.00 | $ 0.00 |
| 8. Income from real property | $ 0.00 | $ 0.00 |
| 9. Interest and dividends | $ 0.00 | $ 0.00 |
| 10. Alimony, maintenance or support payments payable to the debtor for the debtor's use or that of dependents listed above | $ 0.00 | $ 0.00 |
| 11. Social security or government assistance (Specify): **Debtor** | $ 1,255.00 | $ 0.00 |
| | $ 0.00 | $ 0.00 |
| 12. Pension or retirement income | $ 0.00 | $ 0.00 |
| 13. Other monthly income (Specify): **Mineral royalty check** | $ 0.00 | $ 100.00 |
| | $ 0.00 | $ 0.00 |
| 14. SUBTOTAL OF LINES 7 THROUGH 13 | $ 1,255.00 | $ 100.00 |
| 15. AVERAGE MONTHLY INCOME (Add amounts shown on lines 6 and 14) | $ 1,255.00 | $ 100.00 |
| 16. COMBINED AVERAGE MONTHLY INCOME: (Combine column totals from line 15) | $ 1,355.00 | |

(Report also on Summary of Schedules and, if applicable, on Statistical Summary of Certain Liabilities and Related Data)

17. Describe any increase or decrease in income reasonably anticipated to occur within the year following the filing of this document:



EXHIBIT
B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re the matter of          )
                             )   CHAPTER 7
RICHARD RYAN DEMPSEY and      )
EILEEN M. DEMPSEY,            )
                             )
        vs.                   )   No. 08 B 33951
                             )
        Debtors,              )   JUDGE JACQUELINE P. COX

        The deposition of RICHARD DEMPSEY, called by
Creditor Dr. George McCarthy for examination, taken
pursuant to notice and pursuant to the Federal Rules
of Civil Procedure for the United States District
Courts pertaining to the taking of depositions, taken
before Kelly A. Siska, Certified Shorthand Reporter
and Notary Public at 166 West Washington Street, Suite
300, Chicago, Illinois, commencing at 1:00 p.m. on the
7th day of May, A.D., 2009.

---

3

I N D E X

WITNESS                                    PAGE

RICHARD DEMPSEY

    Examination by Mr. Bielski............  4

E X H I B I T S

(NO EXHIBITS MARKED)

C E R T I F I E D   Q U E S T I O N S

                                           PAGE

BY MR. BIELSKI:  ....................  80
Q.   Are there any other managers of
     Greenhead?
A.   No.  One's enough.
Q.   And so there's how many members
     currently that you manage?
A.   There's ten.
Q.   Ten members?
A.   I'm sorry.  There's nine members.
     Nine members.
Q.   You're not a member but you're a
     manager?
A.   Yeah.
Q.   And who are the members?
A.   I gave --
MR. INGRAM:  I object.  I can't possibly
     see how that could be relevant to
     a 2004 examination.

---

2

APPEARANCES:

    MESSER & STILP, LTD.
    MR. JOHN N. BIELSKI, II
    166 West Washington Street
    Suite 300
    Chicago, Illinois  60602
    Phone:  (312) 334-3476

        On behalf of Dr. George McCarthy;

    FORREST L. INGRAM, P.C.
    MR. FORREST L. INGRAM
    MR. GAUTHAM KAVETI
    79 West Monroe Street
    Suite 900
    Chicago, Illinois  60603
    Phone:  (312) 759-2838

        On behalf of Richard Dempsey and
        Eileen Dempsey.

ALSO PRESENT:  Eileen Dempsey
               Dr. George McCarthy

               * * * * *

---

4

        (witness sworn.)

    MR. BIELSKI:  Let the record reflect this is a
2004 examination of Mr. Richard Ryan Dempsey in case
No. 08 33951 pending in the United States Bankruptcy
Court for the Northern District of Illinois, Eastern
Division.  This examination is taken pursuant to court
order.  It was set today also by agreement of the
parties.

WHEREUPON:

        RICHARD DEMPSEY,

called as a witness herein, having been first duly
sworn, was examined and testified as follows:

                    EXAMINATION

BY MR. BIELSKI:

    Q.   Mr. Dempsey, my name is John Bielski.  I
represent Dr. George McCarthy as a claimant in this
case.  I know you sat through your wife's examination,
but I'll just run through the rules one more time just
so we're clear and make this as smooth as possible.
First thing to know is the person to your left is a
court reporter.  She's taking down everything you say
here today.  Accordingly, all your answers need to be
verbal in nature.  No nods of the head, shoulder
shrugs, anything like that.  Do you understand that?

EXHIBIT
C

Blumberg No. 5119

7

1    A.  I do.

2    Q.  Also, I'm not here to trick you.  If

3 there's any questions you do not understand, please

4 ask me and I will rephrase the question.  I'm assuming

5 if you answer a question, you understood what that

6 question was.  Do you understand that?

7    A.  Yes.

8    Q.  Finally, if you need a break for any

9 reason, just say so and we will accommodate you; all

10 right?

11    A.  Yes.

12    Q.  Please state your legal name?

13    A.  Richard Ryan Dempsey.

14    Q.  What's your current address?

15    A.  2626 North Lakeview, Apartment 1303,

16 Chicago, 60614.

17    Q.  How long have you lived at that address?

18    A.  Approximately four years.  I'm sorry.

19 Approximately seven months.

20    Q.  Where did you live prior to the seven

21 months ago?

22    A.  Same apartment buildings, but apartment

23 703.

24    Q.  Who lives with you at the current address?

---

1    Q.  Who signed the lease on behalf of Demhoff?

2    A.  I did.

3    Q.  Anybody else?

4    A.  No.

5    Q.  The unit at 703, who was the tenant in that

6 unit?

7    A.  My wife and myself.

8    Q.  It was not Demhoff?

9    A.  No.

10    Q.  Anybody else on that lease?

11    A.  No.

12    Q.  The current lease you have at 1307, did you

13 personally guarantee it or is your name on that?

14    A.  No.

15    Q.  Other than your signature for Demhoff?

16    A.  That's correct.

17    MR. INGRAM:  If I may, I think the number is

18 1303.

19    MR. BIELSKI:  1303.  I apologize.  1303.  Sorry.

20 BY MR. BIELSKI:

21    Q.  Are you currently employed?

22    A.  No.

23    Q.  Are you retired?

24    A.  Yes.

---

6

1    A.  My wife Eileen Dempsey.

2    Q.  Anybody else?

3    A.  No.

4    Q.  Who lived with you at, was it, 703?

5    A.  703, yes.

6    Q.  Who lived with you there?

7    A.  My wife Eileen Dempsey.

8    Q.  Anybody else?

9    A.  No.

10    Q.  Are you the owner of the current unit?

11    A.  No.

12    Q.  Who's the owner?

13    A.  Nancy Detrich.

14    Q.  And what's your connection to Nancy?

15    A.  I'm a lessee.  She's the owner.

16    Q.  Do you know her outside of this?

17    A.  No, I do not.

18    Q.  Who is the -- have you seen the lease for

19 this unit?  Have you seen the lease for 1307?

20    A.  Yes.

21    Q.  And who is the tenant on the lease?

22    A.  Demhoff Corporation.

23    Q.  Has it always been Demhoff Corporation?

24    A.  Yes.

---

8

1    Q.  How long have you been retired?

2    A.  Well, I retired in '69 from the last job I

3 had.

4    Q.  How did you make -- do you make any kind of

5 income currently?

6    A.  I was a trader on the Chicago Mercantile

7 for a number of years.

8    Q.  How long were you a trader?

9    A.  Since 1970 till -- off and on up until last

10 year.

11    Q.  So through 2008?

12    A.  Yeah.

13    Q.  Can you describe to me what you did as a

14 trader?

15    A.  Speculator.

16    Q.  In any particular futures?

17    A.  Mainly the meat industry, buy cattle and

18 hog.

19    Q.  How did you trade?  Under your name?  Under

20 the corporation?

21    A.  Under Demhoff Corporation.

22    Q.  Did you trade under any other corporations?

23    A.  No.

24    Q.  How long did you trade under Demhoff?

11

```
1    A.   Well, I don't know.  It was probably 30
2   years.
3    Q.   Did you ever -- did you receive a salary
4   from Demhoff?
5    A.   No.
6    Q.   Did you receive dividends from Demhoff?
7    A.   No.
8    Q.   Did you receive payments from Demhoff?
9    A.   Yes.
10    Q.   When did you receive payments?
11    A.   I was sole owner so if I needed to take
12   money out I just took money out as a loan.
13    Q.   Did you take any money out of Demhoff in
14   the last four years?
15    A.   Yes.
16    Q.   When was the last time you took a payment
17   out?
18    A.   Probably, maybe January this year.
19    Q.   January '09?
20    A.   Yes.
21    Q.   How much was that?
22    A.   I can't recall.
23    Q.   Over 10,000?
24    A.   No, I don't think so.
```

JENSEN REPORTING  (312) 236-6936

11

```
1   think, 2008 when I transferred it over.
2    Q.   Did you file tax returns for 2008
3   personally yet?
4    A.   No.
5    Q.   File an extension?
6    A.   Yes.
7    Q.   Who does your tax returns?
8    A.   Jerry Sparks.
9    Q.   When's the last tax return that you filed?
10    A.   '07.
11    Q.   Was that jointly with your wife or
12   individually?
13    A.   Individually.
14    Q.   Did you receive any payments from Demhoff
15   in 2007?
16    A.   Yes.
17    Q.   How much approximately?
18    A.   I would say 100, 150.
19    Q.   What was the 100 to 150 for?  What was the
20   type of --
21    A.   Personal expenses.
22    Q.   And what accounts did Demhoff give you that
23   money to?
24    A.   My personal checking account.
```

JENSEN REPORTING  (312) 236-6936

10

```
1    Q.   Did you receive payments from Demhoff in
2   '08?
3    A.   Yes.
4    Q.   How much approximately?
5    A.   I don't know.
6    Q.   One hundred dollars?
7    A.   Oh, no.  More than that.
8    Q.   Ten thousand?
9    A.   More than that.
10    Q.   Hundred thousand?
11    A.   More than that.
12    Q.   Three hundred thousand?
13    A.   I don't think that high.  Maybe 200 to 300.
14    Q.   That was paid to you?
15    A.   Yes.  Wire transfers were to my account.
16    Q.   I'm sorry?
17    A.   Yes.  I would say around 200,000.
18    Q.   That came from Demhoff to you individually?
19    A.   Yes.
20    Q.   What account would that be deposited into?
21    A.   My personal account.
22    Q.   Who's that with?
23    A.   It was initially with LaSalle Bank of
24   America and then it would be with Chase Bank from, I
```

JENSEN REPORTING  (312) 236-6936

12

```
1    Q.   That was LaSalle Bank?
2    A.   Yes.
3    Q.   In 2006, do you recall how much you
4   received from Demhoff?
5    A.   I would say somewhere around 100,000 to
6   150,000.
7    Q.   In the last four years, are you aware of
8   whether Eileen Dempsey ever received any money from
9   Demhoff?
10    A.   Yes.
11    Q.   How much did she receive from Demhoff?
12    A.   I don't know.
13    Q.   Let's start off with '08.  Do you recall
14   how much she received in '08?
15    A.   No, I don't recall.
16    Q.   Was it over $100?
17    A.   Yes.
18    Q.   Over a thousand?
19    A.   Yes.
20    Q.   Over 10,000?
21    A.   Yes.
22    Q.   Over 100,000?
23    A.   No.
24    Q.   So 10,000 to 100,000 would be a range?
```

JENSEN REPORTING  (312) 236-6936

13

```
1      A.   Yeah.
2      Q.   Where was that money -- was it given
3   directly to her or put into her account?
4      A.   Put into her account.
5      Q.   What account?
6      A.   Her personal account.
7      Q.   Was that LaSalle Bank?
8      A.   Yeah.
9      Q.   In 2007, did she receive any money from
10  Demhoff?
11     A.   Yes.  Some money, yes.
12     Q.   How much?
13     A.   I don't know.
14     Q.   Over 10,000?
15     A.   I would say yes.
16     Q.   Over 50?
17     A.   Probably 50.
18     Q.   Around 50,000?
19     A.   Yeah.
20     Q.   That was put into the LaSalle Bank?
21     A.   Yeah.
22     Q.   Do you recall what account it came from
23  from Demhoff?
24     A.   Well, it was in the Demhoff checking
```

15

```
1      Q.   Generally, what does Demhoff do?  What's
2   the business of Demhoff?
3      A.   It's a shell corporation.  It's a
4   corporation that was formed in 1969 and had real
5   estate interest and various investments.
6      Q.   Who owns Demhoff?
7      A.   I own Demhoff, 100 percent.
8      Q.   Who's the officers and directors of
9   Demhoff?
10     A.   I'm the sole officer and director.  There's
11  two directors.  I'm the sole officer.  There are two
12  directors.
13     Q.   Who's the other director?
14     A.   My son, John Dempsey.
15     Q.   But he's not an officer of Demhoff?
16     A.   2626 North Lakeview.
17     Q.   But John Dempsey, is he an officer of --
18     A.   I'm sorry.  No, he's not an officer.
19     Q.   Just a director?
20     A.   Yes.
21     Q.   So it's you and John are directors?
22     A.   Right.
23     Q.   Has it been that way for the last four
24  years?
```

14

```
1   account.  We transferred it to her account.
2      Q.   Where was the Demhoff account at?
3      A.   At the same bank.
4      Q.   LaSalle Bank?
5      A.   Yes.
6      Q.   In 2006, did Eileen receive any money from
7   Demhoff?
8      A.   I don't know.  I would say yes.
9      Q.   But do you recall how much?
10     A.   No, I don't.
11     Q.   Over 50?
12     A.   Thousand?
13     Q.   Yes.
14     A.   I don't believe so.
15     Q.   Over 10,000?
16     A.   Yes.
17     Q.   In 2009, has Eileen Dempsey received any
18  money from Demhoff?
19     A.   No, I don't think so.
20     Q.   Have you received any money in 2009 from
21  Demhoff?
22     A.   I testified to it earlier in January '09.
23     Q.   Other than January?
24     A.   No, I don't think so.
```

16

```
1      A.   Yes.
2      Q.   And it's been that, that John Dempsey has
3   not been an officer for the last four years?
4      A.   No, he has not been an officer.  He's a
5   director.
6      Q.   Does John Dempsey trade for Demhoff?
7      A.   No.
8      Q.   Has he ever traded in the last four years
9   for Demhoff?
10     A.   No.
11     Q.   Where does John live?
12     A.   Arlington, Virginia.
13     Q.   Do you know what his current employment is?
14     A.   He's a county officer.
15     Q.   Police officer?
16     A.   Yes.
17     Q.   You have a daughter; is that correct?
18     A.   Right.
19     Q.   What's her name?
20     A.   Kathleen.
21     Q.   Has Kathleen ever been an officer or
22  director of Demhoff?
23     A.   No.
24     Q.   Has Kathleen ever traded for you?
```

19

1    A.    No.

2    Q.    Now, you traded at the Board of Trade?

3    A.    I traded Chicago Mercantile, down at the
4    CME group.

5    Q.    Is it okay if I refer to it as CME?

6    A.    Yeah.  Fine.  It's the same thing.

7    Q.    Have you in the last four years owned any
8    seats at the CME?

9    A.    No.

10   Q.    Do you -- have you owned any interest in
11   CME the last four years?

12   A.    No.

13   Q.    Do you have any credit cards?

14   A.    No.

15   Q.    Have you owned any credit cards in the last
16   four years?

17   A.    Last four years?

18   Q.    Yes.

19   A.    Yes.

20   Q.    In 2008, did you own any cards?  I guess
21   own is the wrong word.

22   A.    I think I did, yes.

23   Q.    Do you recall which cards those were?

24   A.    I think I had an American Express and maybe

---

1    Q.    How long has the Burling been inactive?

2    A.    Inactive?

3    Q.    Yeah.

4    A.    Probably a year and a half.

5    Q.    Do you know how much is currently in the
6    Chase Bank account?

7    A.    City bank?  About a thousand dollars.

8    Q.    How about at Regents Bank?

9    A.    Under 100.

10   Q.    And Burling?

11   A.    One hundred, 140.

12   Q.    Any other accounts besides Chase, Regents,
13   or Burling?

14   A.    No.

15   Q.    Those are all checking accounts?

16   A.    All checking accounts.

17   Q.    Do you have any other accounts at Chase,
18   Regents, or Burling other than checking?

19   A.    No.

20   Q.    Do you have any certificates of deposit?

21   A.    No.

22   Q.    Have you had any in the last four years?

23   A.    No.

24   Q.    Do you have any money market accounts in

---

18

1    a couple others.  I don't remember or recall what they
2    were.

3    Q.    Do you have any current savings accounts?

4    A.    No.

5    Q.    Do you have any current checking accounts?

6    A.    Yes.

7    Q.    With who?

8    A.    Chase is my current checking account.

9    Q.    Any other accounts besides Chase?

10   A.    I have one at Regents Bank.

11   Q.    Where's Regents Bank.  Is there a branch
12   location in Florida?

13   A.    Florida, yeah.  Right.  It's an inactive
14   account.  I do have an account there.  A small
15   balance.

16   Q.    Is that in Lakeside?

17   A.    No, no.  I opened it up in Florida when I
18   was in Florida.

19   Q.    What city?

20   A.    Silver Springs.  I don't remember the
21   address down there.  But I never use the account at
22   all.  And I have a small bank account in the Burling
23   Bank which is in the Chicago Board of Trade building,
24   but that's been inactive.

---

20

1    the last four years?

2    A.    No.

3    Q.    How about mutual funds?

4    A.    No.

5    Q.    Do you own -- have you owned any stocks in
6    the last four years?

7    A.    Yes.

8    Q.    Where?

9    A.    Demhoff and Chillicothe Construction.

10   Q.    Anybody else?

11   A.    No.

12   Q.    How about Linda Lou's?

13   A.    Pardon?

14   Q.    Linda Lou's?

15   A.    Oh.  I'm sorry.  Linda Lou's, yes.

16   Q.    Linda Lou's, Demhoff, and Chillicothe?

17   A.    That's right.

18   Q.    Any other entities?

19   A.    No.

20   Q.    Have any shares of stock in Chillicothe,
21   Demhoff, or Linda Lou's been transferred in the last
22   four years?

23   A.    Yes.

24   Q.    Start with Chillicothe.  Was any shares

23

```
 1   transferred?
 2       A.    No.
 3       Q.    Demhoff?
 4       A.    No.
 5       Q.    Linda Lou's?
 6       A.    Yes.
 7       Q.    What was transferred in Linda Lou's?
 8       A.    My 50.  My 50 shares were transferred to
 9   Linda Lou in December of '07.
10       Q.    Who did you transfer your shares to?
11       A.    Linda Ellison.
12       Q.    Who's Linda Ellison?
13       A.    She was the co-owner.
14       Q.    Of Linda Lou's?
15       A.    Yes.
16       Q.    What's the exact title of that corporation?
17       A.    Linda Lou's, Inc.
18       Q.    It's not Linda Lou's 119?
19       A.    No.  Maybe it is.  Linda Lou's 119.  Maybe
20   you're right.
21       Q.    So that was transferred, 50 shares, in
22   December of '07?
23       A.    Yeah.
24       Q.    Did you receive any money for that
```

23

```
 1       A.    That was it.
 2       Q.    When's the last time you've been at Linda
 3   Lou's?
 4       A.    A month ago.
 5       Q.    Have you been an officer at all in the last
 6   four years?
 7       A.    I was secretary/treasurer up until -- from
 8   the formation of the corporation till 2007.
 9       Q.    What about director?  Have you been a
10   director of Linda Lou's?
11       A.    Yes.
12       Q.    When was that?
13       A.    From the beginning to 2007.
14       Q.    So in December of '07 you stopped being a
15   director and stopped being an officer; correct?
16       A.    Yes.  And shareholder.
17       Q.    And shareholder.  Who's the current -- if
18   you know, who's the current owner of the shares of
19   Linda Lou's?
20       A.    Linda Ellison.
21       Q.    Do you know who the current officer of
22   Linda Lou's is?
23       A.    I believe Linda Ellison.
24       Q.    What about director?
```

22

```
 1   transfer?
 2       A.    Exchange of debt.
 3       Q.    You owed her a debt?
 4       A.    Yes.
 5       Q.    How much did you owe her?
 6       A.    Forty thousand.
 7       Q.    Did you owe any debt to Linda Lou's?
 8       A.    Linda Lou's had a bank loan.  I did not owe
 9   any money personally to Linda Lou's.
10       Q.    Did Linda Lou's owe you any money?
11       A.    Yes.
12       Q.    How much?
13       A.    When we first established the corporation
14   in '99, they owed me $90,000.
15       Q.    How about in the last four years?
16       A.    No.
17       Q.    No promissory notes to you from Linda
18   Lou's?
19       A.    No.
20       Q.    In the last four years?
21       A.    No.
22       Q.    Anything else exchanged besides the
23   elimination of debt when you transferred the shares in
24   '07?
```

24

```
 1       A.    I believe Linda Ellison.
 2       Q.    Just generally what is Linda Lou's?
 3       A.    It's a bar and restaurant.
 4       Q.    That's the business purpose?
 5       A.    Yeah.
 6       Q.    Is it a corporation?
 7       A.    Yes.
 8       Q.    Do you know what state -- is it an Illinois
 9   corporation?
10       A.    A what?
11       Q.    Is that an Illinois corporation?
12       A.    Yes.
13       Q.    Have you owned any bonds in the last four
14   years?
15       A.    No.
16       Q.    Do you know if your wife has owned any
17   bonds?
18       A.    I don't believe so.
19       Q.    Do you know if your wife owned any shares
20   of stock in the last four years?
21       A.    No, I don't.
22       Q.    You don't know if she owned it?
23       A.    I don't know if she owned it.
24       Q.    Do you know if your wife had any bank
```

1 accounts in the last four years?

2     A.    Yes, she did.

3     Q.    Where at?

4     A.    Bank of America which was LaSalle Bank and

5 Chase Bank.

6     Q.    So the same banks that you have accounts

7 in?

8     A.    Yes.

9     Q.    Do you have any lock boxes?

10     A.    I have a safety deposit box at Harris Bank

11 of Hinsdale.

12     Q.    What's in that box?

13     A.    I don't know.  Long time since I've been

14 there.

15     Q.    When's the last time you looked at the box?

16     A.    I would say a year ago.

17     Q.    What did you see in it a year ago?

18     A.    A couple of coins and some old boat titles.

19     Q.    Where are the boats?  Have they been —

20     A.    Well, they're old.  They're expired.  They

21 were sold to the — they were sold in 2006.

22     Q.    Who were they sold to?

23     A.    The Greenhead Hunting Club.

24     Q.    Any other lock boxes?

---

1     A.    No.

2     Q.    Whose name is on that lock box, you and

3 anybody else?

4     A.    Eileen Dempsey.

5     Q.    Anybody else?

6     A.    No.

7     Q.    Do you own any life insurance policies?

8     A.    Correct.

9     Q.    How much?

10     A.    The original policy I believe was $5,000

11 taken out 40 years ago by my father, and I think it

12 was increased to 6,500.  And it would be eight or nine

13 years ago.

14     Q.    Is there any vested amount in that policy?

15     A.    Yeah, there's a vested amount.

16     Q.    How much?

17     A.    I think it's around 25,000.

18     Q.    And that policy covers you?

19     A.    Yes.

20     Q.    Who's the beneficiaries?

21     A.    Eileen Dempsey.

22     Q.    Anybody else?

23     A.    No.

24     Q.    Do you currently have any health insurance

---

1 policies?

2     A.    No.  Well, I have Medicare.  I have

3 Medicare, but I don't have anything else.

4     Q.    So Medicare covers health?

5     A.    Yeah.

6     Q.    Do you have any homeowner's or renter's

7 insurance?

8     A.    No.

9     Q.    Do you know if Eileen has any life

10 insurance or health insurance policies?

11     A.    I'm not aware of any.

12     Q.    Who's your insurance agent, if you have

13 one?

14     A.    What type of insurance?

15     Q.    Any insurance.

16     A.    Tom Marzec would be our automobile

17 insurance.

18     Q.    Do you currently have automobile insurance?

19     A.    No.

20     Q.    Do you currently have any autos?

21     A.    No.

22     Q.    Do you own or lease any autos?

23     A.    No, I do not.

24     Q.    Have you in the last four years?

---

1     A.    No.

2     Q.    What about a Tahoe?

3     A.    Well, Demhoff has a Tahoe.  I don't have a

4 Tahoe.

5     Q.    You use the Tahoe from Demhoff?

6     A.    Yes.

7     Q.    Any other automobiles that you use from

8 Demhoff?

9     A.    No.

10     Q.    How long has Demhoff owned that automobile?

11     A.    They bought it, I believe, in March of '05.

12     Q.    Did you pay anything to Demhoff to use that

13 automobile?

14     A.    Yes.  I traded in an '03 Tahoe that was

15 personally owned by me and I used the funds for credit

16 to purchase the '05 Tahoe in Demhoff's name.  And I

17 think they gave me $18,000 trade-in value for it.

18     Q.    Does Demhoff own the Tahoe or lease it?

19     A.    They own it.  It's in their name.

20     Q.    Is it owned completely or is there a loan?

21     A.    There's a loan on it.

22     Q.    How much?

23     A.    Fifty-three hundred.

24     Q.    How many miles on that Tahoe?

1    A.   One hundred seventy-five thousand.

2    MR. INGRAM:  I object.  This is going into assets

3  that are owned by a corporation and it's not assets of

4  the estate.

5  BY MR. BIELSKI:

6    Q.   Have you owned any art in the last four

7  years?

8    A.   Pardon?

9    Q.   Have you owned any art?

10    A.   No.

11    Q.   Do you know if Eileen's owned any art in

12  the last four years?

13    A.   No, I don't.

14    Q.   Do you own any and have antiques or

15  heirlooms?

16    A.   No.

17    Q.   Have you owned any in the last four years?

18    A.   No.

19    Q.   Has Eileen?

20    A.   Not that I'm aware of.

21    Q.   Do you currently have any pension plans

22  such as 401(k)s, 403(b)s, or anything like that?

23    A.   No.

24    Q.   Does Eileen?

---

1  cards, stamps, or coin collections?

2    A.   No.

3    Q.   Other than those few coins in the box?

4    A.   No, not really.

5    Q.   Have you owned any in the last four years?

6    A.   No.

7    Q.   Has Eileen?

8    A.   Not that I'm aware of.

9    Q.   Are you the holder of any promissory notes?

10    A.   No.

11    Q.   Have you been the holder of any notes in

12  the last four years?

13    A.   No.

14    Q.   Have you bought anything on installment

15  plans in the last four years?

16    A.   Just the automobile.

17    Q.   That's Demhoff's automobile?

18    A.   Yeah.  I haven't personally, no.

19    Q.   We will come back to this.  This, for the

20  record, is marked D55.

21    MR. INGRAM:  Okay.  I'm going to make a

22  preliminary objection subject to whether or not you

23  show that there's anything in here having to do with

24  assets of the estate.

---

1    A.   Not that I'm aware of.

2    Q.   Have either of you owned a pension plan in

3  the last four years?

4    A.   No.

5    Q.   Do you own any recreational vehicles,

6  trailers, or boats?

7    A.   No.

8    Q.   Have you in the last four years?

9    A.   No.

10    Q.   What is your current source of income?

11    A.   Social Security.

12    Q.   Anything else?

13    A.   No.

14    Q.   Do you know what Eileen's current source of

15  income is?

16    A.   Royalties from an oil well and Social

17  Security.

18    Q.   Do you own any precious metals?

19    A.   No.

20    Q.   Have you in the last four years?

21    A.   No.

22    Q.   How about Eileen?

23    A.   Not that I'm aware of.

24    Q.   Any kind of collection such as baseball

---

1  BY MR. BIELSKI:

2    Q.   You mentioned earlier that you got a

3  payment from Demhoff; correct?

4    A.   Yeah.

5    Q.   This year?

6    A.   I believe so.

7    Q.   Looking at the line dated January of '09,

8  amount $23,780.59?

9    MR. INGRAM:  Could you point that out?  January

10  '09.

11    MR. BIELSKI:  (Indicating.)

12    MR. INGRAM:  There it is.

13  BY MR. BIELSKI:

14    Q.   Is that the transfer that you mentioned

15  before?

16    A.   Uh-huh.

17    Q.   From Demhoff to you?

18    A.   Yes.

19    Q.   Have you reported that in the bankruptcy

20  filings at all?

21    A.   Bankruptcy were filed before this.

22    Q.   As income?

23    A.   No.

24    Q.   Do you have any statements from Demhoff for

35

1   February, March, or April of this year?
2        MR. INGRAM:  Of this year?  I object to that.
3   That's absolutely irrelevant.
4   BY THE WITNESS:
5        A.   I don't have --
6        MR. BIELSKI:  I'm still making a demand.
7        MR. INGRAM:  I have an objection in any case.
8   Income that comes in after the filing is not property
9   of the estate.
10       MR. BIELSKI:  That's correct.  We'll get to that.
11       MR. INGRAM:  So any income that comes in after
12  the filing is not property of the estate.  Not proper
13  for a 2004 exam.
14  BY MR. BIELSKI:
15       Q.   Are you currently involved in any other
16  court proceedings besides this one?
17       A.   No.
18       Q.   No?
19       A.   (Shaking head.)
20       Q.   Have you been involved with any court
21  proceedings in the last four years other than this
22  one?
23       A.   Yes.
24       Q.   Which one, or ones, I should say.

---

1   him, please.
2   BY MR. BIELSKI:
3        Q.   Have you made any provisions to release
4   yourself from debt or transfer assets to creditors in
5   the last four years?
6        A.   Yes.  Linda Lou's.
7        Q.   Other than that?
8        A.   No.
9        Q.   Other than Linda Lou's, have you
10  transferred any property within the last four years?
11       A.   No.
12       Q.   What's your average monthly expense?
13       MR. INGRAM:  Excuse me.  Does that show up on
14  Schedule J?
15       MR. BIELSKI:  We can go through that if you want.
16  BY MR. BIELSKI:
17       Q.   I showed to counsel what's been filed as
18  Schedule J.  Do you recognize this document,
19  Mr. Dempsey?
20       A.   I do.
21       Q.   What is it?
22       A.   It's a current list of expenses, monthly
23  expenses.
24       Q.   Looking at the first line, $700?

---

34

1        A.   My DUI in July of '08.
2        Q.   Any other proceedings?
3        A.   No.
4        Q.   You obviously read George McCarthy's
5   lawsuit?
6        A.   Yeah.
7        Q.   Any other proceedings besides his or the
8   DUI?
9        A.   No.
10       MR. INGRAM:  Is that case prior to four years
11  ago?
12       MR. BIELSKI:  That case, the judgment was January
13  of '08.  It's 00 L 933, DuPage County case.  Judgment
14  was January.
15  BY MR. BIELSKI:
16       Q.   Have you made any assignments for the
17  benefit of creditors in the last four years?
18       A.   Please repeat that.
19       Q.   Have you made any assignment for the
20  benefit of creditors in the last four years?
21       MR. INGRAM:  First of all, do you know what an
22  assignment is?
23       THE WITNESS:  No.
24       MR. INGRAM:  May I ask you to explain that to

---

36

1        A.   Yes.
2        Q.   What is that for?
3        A.   Rent.
4        Q.   Who are you paying rent to?
5        A.   Demhoff Corporation.
6        Q.   You pay Demhoff 700 bucks?
7        A.   I have not paid them 700.  I owe them $700.
8        Q.   Seven hundred a month?
9        A.   Yes.
10       Q.   When was the last time you paid any money
11  to Demhoff?
12       A.   I don't recall.
13       Q.   Do you know what the total balance owed to
14  Demhoff is?
15       A.   No.
16       Q.   Do you have an approximation for rent?
17       A.   I would say probably $4,000.
18       Q.   And this is rent of what?  What are you
19  renting from Demhoff?
20       A.   Space in their office.
21       Q.   At 2626 North Lakeview?
22       A.   Yes.
23       Q.   Is that their corporate office?
24       A.   Yes.

39

1    Q.    They have a license to have an office

2    there?

3    A.    I don't know if we need a license.

4    Q.    So you don't know one way or the other?

5    A.    I don't know one way or the other.

6    Q.    Going to line 2, utilities, electricity,

7    and heating fuel, $100; is that accurate?

8    A.    Yes.

9    Q.    What's that utilities for?

10   A.    The apartment.

11   Q.    2626 North Lakeview?

12   A.    Yes.

13   Q.    Line 2C, telephone, $200.  Is that a cell

14   phone or what kind of telephone is that?

15   A.    Well, we have a -- Eileen and I both have a

16   cell phone.

17   Q.    That's the Verizon phone?

18   A.    Well, mine's Sprint.  Hers is Verizon.

19   Q.    Looking down on line 18 it says, Average

20   monthly expenses.  Do you see that?

21   A.    Yes.

22   Q.    Is that an accurate statement that your

23   average monthly expenses are $1,570?

24   A.    I would say that's probably low.

JENSEN REPORTING  (312) 236-6936

---

39

1    Q.    And then average monthly income 1,355,

2    would you say that's accurate?

3    A.    Yeah.  That's my Social Security check.

4    Q.    Does that include any payments from

5    Demhoff?

6    A.    No.

7    Q.    Would any payments from Demhoff affect that

8    number?

9    A.    It would make it go up.

10   Q.    By how much?

11   A.    Well, I don't know.

12   Q.    Well, you say you have between 200,000 or

13   300,000 from Demhoff last year; is that correct?

14   A.    I don't recall.

15   Q.    You don't recall saying that?

16   A.    No, I don't recall the income from that.

17   You say I said that?

18   Q.    I'm asking you, do you recall?

19   A.    Saying that, yes.

20   Q.    So if we divide that by 12, that number

21   will go --

22   A.    Yes.

23   Q.    Do you owe any money to Demhoff?

24   A.    Yes.

JENSEN REPORTING  (312) 236-6936

---

38

1    Q.    What would you say that should be?

2    A.    I'd say it's probably closer to 10,000 a

3    month.

4    Q.    Ten thousand a month?

5    A.    Uh-huh.

6    Q.    How do you get from 1,570 a month to 10,000

7    a month?

8    A.    Well, I think these were basic expenses

9    that occurred for minimum things I put on this monthly

10   statement.

11   Q.    What would be increased to $10,000?  What

12   expenses?

13   A.    Well, I don't know.  Maybe the car or

14   something.  Of course, the car, personal expenses.

15   MR. INGRAM:  This is just personal.  It's not the

16   expenses of Demhoff.

17   BY THE WITNESS:

18   A.    Okay.  I don't know.  I can't answer that.

19   Q.    Well, as your counsel alluded to, there's

20   Demhoff expenses and personal expenses; correct?

21   A.    Yeah.

22   Q.    Would you say this is accurate for your

23   personal expenses, this line 18?

24   A.    Yes.  I would say it's accurate.

JENSEN REPORTING  (312) 236-6936

---

40

1    Q.    How much do you owe?

2    A.    I don't know.

3    Q.    Do you know what you owe Demhoff, what it's

4    for?

5    A.    Well, Demhoff is first a corporation that

6    as I take money out it's recorded as loans and at the

7    balance of every year they file reports.

8    Q.    You say they file.  Who's filing?

9    A.    Well, my tax attorney.

10   Q.    Jerry Sparks?

11   A.    Yes.

12   Q.    Do you know who signs the tax returns?

13   A.    I do.

14   Q.    Anybody else responsible for tax returns

15   other than you or Jerry Sparks?

16   A.    No.

17   Q.    And if you had to make an estimate of what

18   you owe Demhoff, what would it be?

19   A.    Oh, probably -- I don't know -- 150,000.

20   Q.    Do you have any knowledge of what the

21   150,000 is for?

22   A.    No.

23   Q.    Do you have any notes or contracts that

24   evidence that debt?

JENSEN REPORTING  (312) 236-6936

41

1   A.   No.

2   Q.   Does Demhoff owe you any money?

3   A.   No.

4   Q.   Does Demhoff owe Eileen Dempsey any money?

5   A.   No.

6   Q.   Does Eileen owe Demhoff any money?

7   A.   No.

8   Q.   Do you owe Chillicothe any money?

9   A.   No.

10   Q.   Does Chillicothe owe you any money?

11   A.   No.

12   Q.   Does Eileen Dempsey owe Chillicothe any

13   money?

14   A.   No.

15   Q.   Does Chillicothe owe Eileen Dempsey any

16   money?

17   A.   No.

18   Q.   Do you currently have any tax refunds owed

19   to you?

20   A.   Not that I'm aware of.

21   Q.   Have you had any tax refunds owed to you in

22   the last four years?

23   A.   No.

24   Q.   Do you know if Eileen Dempsey is owed any

42

1   tax refunds?

2   A.   Not that I'm aware of.

3   Q.   Do you own any real estate?

4   A.   No.

5   Q.   Have you owned any real estate in the last

6   four years?

7   A.   No.

8   Q.   Has Eileen Dempsey owned real estate in the

9   last four years?

10   A.   Not that I'm aware of.

11   Q.   Are you the beneficiary of any type of

12   insurance policy?

13   A.   No.

14   Q.   Are you the beneficiary of any type of

15   trust?

16   A.   No.

17   Q.   Do you know if Eileen's a beneficiary of

18   any trust?

19   A.   Not that I'm aware of.

20   Q.   Do you have any judgments in your favor?

21   A.   No.

22   Q.   Do you have any lawsuits pending against

23   anybody currently?

24   A.   No.

43

1   Q.   Do you have any interest in any property

2   that we haven't discussed such as horses, guns?

3   A.   I have a shotgun.

4   Q.   One shotgun?

5   A.   Yes.

6   Q.   What kind of shotgun is it?

7   A.   Twelve gauge.

8   Q.   What brand?

9   A.   Winchester.

10   Q.   What model?

11   A.   Winchester T Super X3.

12   Q.   And you believe the value listed for that

13   is 500?

14   A.   Five hundred is probably all that it's

15   worth.

16   Q.   Do you own any other guns?

17   A.   No.

18   Q.   I'm showing you Exhibit E.

19   MR. INGRAM:  Schedule E?

20   MR. BIELSKI:  Schedule E.  I'm sorry.

21   BY MR. BIELSKI:

22   Q.   Looking at the first line, the Colorado

23   Department of Revenue, it says, age for husband; is

24   that correct?

44

1   A.   Yes.

2   Q.   What is -- 25,000; is that accurate?

3   A.   Yes.

4   Q.   What is that for?

5   A.   Sales tax on a helicopter.

6   Q.   Sales tax?

7   A.   Yeah.

8   Q.   You owned a helicopter?

9   A.   Well, I was in a corporation that purchased

10   a helicopter and the helicopter went in my name,

11   although I didn't put any money up to buy it.  But

12   because it was registered in my name, they sent me a

13   tax bill.

14   Q.   When was that tax bill sent to you?

15   A.   Oh, I want to say '01.

16   Q.   What corporation was that helicopter in?

17   A.   As I recall, the helicopter was Telluride?

18   Q.   Has Telluride paid any money towards this

19   sales tax to you?

20   A.   No.

21   Q.   Is Telluride in existence?

22   A.   I don't believe so.

23   Q.   And what was the corporation you owned?

24   A.   No.  I was a partner, not an owner.

1  Q.  So you never owned shares of stock or
2  membership interest in that?
3  A.  No.
4  Q.  Did you ever get any income from Telluride?
5  A.  No.
6  Q.  I recall a helicopter crashing?
7  A.  Yeah.  I think it crashed in '02.
8  Q.  When did that crash?
9  A.  '02.
10  Q.  '02?
11  A.  Yeah.
12  Q.  Anybody hurt?
13  A.  Yeah.
14  Q.  Was there lawsuits related to that?
15  A.  No.  There was a lawsuit against the
16  manufacturer of the helicopter.  The pilot broke his
17  back and one of the passengers broke an ankle, but
18  they all survived.
19  Q.  Were you a party in that lawsuit in any
20  way?
21  A.  No.
22  Q.  Was Telluride a party to the lawsuit?
23  A.  No.
24  Q.  Do you know if that lawsuit's been --

1  A.  No, I don't have any knowledge of that.
2  Q.  Did you ever give testimony for that
3  lawsuit?
4  A.  No.
5  Q.  Going to the next line, Illinois Department
6  of Revenue.  It says joint, for joint.  Do you know
7  what that claim is for, $42,137.79?
8  A.  Income taxes.
9  Q.  And it says, here it's disputed; is that
10  accurate?
11  A.  It says what?
12  MR. INGRAM:  Here it says this is disputed.
13  BY THE WITNESS:
14  A.  Yes.
15  Q.  What is being disputed?
16  A.  It's disputed because I claim my residence
17  was in Florida and they claim my residency was here in
18  Illinois.
19  Q.  Did that -- did you ever give testimony for
20  that matter?
21  A.  Yes.
22  Q.  When was that?
23  A.  I would say maybe '06.
24  Q.  And where was that testimony given?

1  A.  Here in Chicago.
2  Q.  Who was present during that?
3  A.  Jerry Sparks and another attorney he had
4  and the state of Illinois.  Illinois Department of
5  Revenue.
6  Q.  Who was the other attorney?
7  A.  I don't recall his name.
8  Q.  Was there a court reporter?
9  A.  No.
10  Q.  Was anything written down from that?
11  A.  I don't recall that, no.
12  Q.  Other than that testimony, did you ever
13  give testimony in that case?
14  A.  No.
15  Q.  Did that actually go -- how did it arrive
16  at 42,137? Was there a court proceeding?
17  A.  Well, they came up with that, but it's
18  still in dispute.  We think we paid it.
19  Q.  Is there a court hearing?  How are you
20  disputing this?
21  A.  No.  We're still trying to fight that out.
22  Q.  So it's not in court?
23  A.  It's not in court.
24  Q.  And is Jerry Sparks handling that?

1  A.  Yes.
2  Q.  Did you ever live in Florida?
3  A.  Yes.
4  Q.  Within the last four years?
5  A.  No.  Part-time.
6  Q.  Part-time?
7  A.  Yeah.
8  Q.  Where did you live in Florida?
9  A.  53 Iris Street.
10  Q.  Who lived there?
11  A.  A niece.
12  Q.  What's her name?
13  A.  Chris James.
14  Q.  Anybody else live there?
15  A.  Her husband, Brian.
16  Q.  When you say part-time, how long would you
17  live there?
18  A.  Oh, I go back and forth couple months a
19  year.
20  Q.  Is that 53 Iris, you said?
21  A.  Yes.
22  Q.  Silver Springs?
23  A.  No.  Clearwater.
24  Q.  Clearwater.  Sorry.  What kind of

residence? Condo? Single family?

A.   No. It's a single family house.

Q.   Do you have any ownership interest in that house?

A.   No.

Q.   Do you have any lease?

A.   No.

Q.   So you just stay there?

A.   Yeah.

Q.   When's the last time you've ever stayed there?

A.   Maybe a year ago.

Q.   How long were you there a year ago?

A.   Couple days.

Q.   Do you have any assets at that location?

A.   No.

Q.   Personal property? Personal belongings?

A.   No.

Q.   Are they still at that address?

A.   As far as I know, yes.

Q.   When's the last time you spoke to them?

A.   Maybe six months ago.

Q.   The next line on this Schedule E, Illinois Department of Revenue bankruptcy section, level 7-425,

---

A.   No.

Q.   Have you had any audits in the last four year?

A.   No.

Q.   Have you been contacted by any IRS agents in the last four years?

A.   No.

Q.   I'll give you Schedule F. Let the record reflect that I showed counsel Schedule F.

Mr. Dempsey, do you recognize this document?

A.   I do.

Q.   What is it?

A.   Schedule F in a bankruptcy filing.

Q.   I've gone through the claims with your wife so I'm going to stick to the ones that you're on or jointly, and the second one down is an Atlantic card. It says husband. What is that?

A.   which page are you on?

Q.   Page sheet 1 of 4.

MR. INGRAM: It should be -- there's a first sheet before the 1 of 4. The 1 of 4 has to do with extensions so there's the primary sheet. It starts with American Express.

---

joint. Do you see that?

A.   Yes.

Q.   That's $105,936.74?

A.   Yes.

Q.   What is that?

A.   Same thing as the line above it. For income taxes assessed, and I wasn't in Illinois. We claim we were in Florida.

Q.   Are you disputing that?

A.   That doesn't say disputed.

Q.   But are you disputing that?

A.   No. Apparently not.

MR. INGRAM: You can always dispute it at a later time. It's not disputed on this thing here.

BY THE WITNESS:

A.   we did dispute it to begin with.

Q.   Are you continuing to dispute it?

A.   Well, we may at a later date.

Q.   You and Eileen?

A.   Yes.

Q.   That's for income tax; correct?

A.   That's correct.

Q.   Do you have any claims from the IRS against you pending currently?

---

MR. BIELSKI: Let's start -- I got it. Thank you for pointing that out.

BY MR. BIELSKI:

Q.   American Express, husband, 69,981. Do you see that?

A.   Yes.

Q.   What is that? Is that a credit card?

A.   Yes.

Q.   Is that open or closed?

A.   Closed.

Q.   And so it was closed June 10th, '06; is that correct?

A.   Yes.

Q.   Is that a personal card?

A.   Yeah.

Q.   That was in your name?

A.   Uh-huh.

Q.   Anybody else's or any other entity on that card?

A.   No.

Q.   Has Demhoff ever paid that card?

A.   I think it has, yes.

Q.   Do you know how much Demhoff has paid American Express?

1    A.    No, I wouldn't have any idea.

2    Q.    Has Chillicothe paid anything to American

3 Express?

4    A.    No.

5    Q.    Let's go to the next line, 59,470. What is

6 that?

7    A.    Credit card.

8    Q.    Is that open or shut?

9    A.    Closed.

10    Q.    When did you close it?

11    A.    I think American closed two years ago.

12    Q.    Is that wholly in your name or is anybody

13 else on that card?

14    A.    My name.

15    Q.    Did Demhoff pay any debts for that?

16    A.    Yes.

17    Q.    How much, do you recall?

18    A.    I don't recall.

19    Q.    Next line, American Express jointly. Do

20 you see that line?

21    A.    Yes.

22    Q.    That's 69,714?

23    A.    Yes.

24    Q.    And it says, Judgment. Do you see that?

1    Q.    Anybody else besides you on that card?

2    A.    No.

3    Q.    Demhoff ever paid anything on that card?

4    A.    No. I don't believe so.

5    Q.    Going down to Bank of America. Bank of

6 America is the last two, the 46,774. What is that?

7    A.    Credit card.

8    Q.    Is it open or shut?

9    A.    Closed.

10    Q.    Anybody else on that card besides you?

11    A.    No.

12    Q.    Has Demhoff ever paid on that card?

13    A.    I don't believe so.

14    Q.    Next card down, Bank of America, 12,507.07?

15    A.    Yeah.

16    Q.    Is that a credit card?

17    A.    Yeah.

18    Q.    Anybody else besides you on that card?

19    A.    No.

20    Q.    Demhoff ever pay for that card?

21    A.    No.

22    Q.    Sheet 2 of 4. See, the account says,

23 Chillicothe Construction?

24    A.    Yeah.

1    A.    Yes.

2    Q.    Was there a judgment in that case?

3    A.    Must have been.

4    Q.    Did you ever appear in court for that

5 matter?

6    A.    No.

7    Q.    Have you ever seen a judgment?

8    A.    No.

9    Q.    And that was -- whose names are on that?

10 You and your wife?

11    A.    I guess, yes.

12    Q.    Anybody else?

13    A.    No.

14    Q.    Did Demhoff ever pay debts on that card?

15    A.    No.

16    Q.    Now to the next page, sheet 1 of 4,

17 Atlantic card. Second one down?

18    A.    Yeah.

19    Q.    It's 14,174?

20    A.    Uh-huh.

21    Q.    What is that?

22    A.    Credit card.

23    Q.    Is that open or shut?

24    A.    Closed.

1    Q.    That's husband; correct? It has an H next

2 to it?

3    A.    Yeah, okay.

4    Q.    One million two hundred twenty-five

5 thousand?

6    A.    Yes.

7    Q.    What is that?

8    A.    Well, I guess that's a loan that

9 Chillicothe Construction is -- funds from George

10 McCarthy was put in Chillicothe Construction that I

11 took out.

12    Q.    When was that taken out?

13    A.    I don't recall. Twenty years ago.

14    Q.    Does that loan have any connection with

15 Dr. McCarthy?

16    A.    Yes.

17    Q.    What is the connection?

18    A.    The base of the lawsuit.

19    Q.    So this is on there because of the lawsuit?

20    A.    It's on there because I helped Chillicothe

21 Construction. Chillicothe Construction owes George

22 and think he got the judgment for that amount of money

23 plus the million two.

24    Q.    Do you have any promissory notes between

---

59

1  you and Chillicothe?
2    A.   No.
3    Q.   Any other agreements between you and
4  Chillicothe evidencing that debt?
5    A.   No.
6    Q.   Going down to the very bottom, First USA
7  Bank/Mileage Plus.  Do you see that?
8    A.   Yes.
9    Q.   What is that?
10   A.   Credit card.
11   Q.   Is that open or shut?
12   A.   Closed.
13   Q.   Anybody on that account besides you?
14   A.   Pardon?
15   Q.   Anybody on that account besides you?
16   A.   No.
17   Q.   Demhoff ever pay anything on that card?
18   A.   Not that I know of.
19   Q.   Page 3 of 4, George J. McCarthy.  Do you
20 see that?
21   A.   Yes.
22   Q.   Judgment, DuPage County?
23   A.   Yes.
24   Q.   That's the case you alluded to before;

JENSEN REPORTING  (312) 236-6936

---

58

1  correct?
2    A.   Correct.
3    Q.   The 2,579,004.11?
4    A.   Correct.
5    Q.   Do you recall what that lawsuit was about?
6    A.   Yes.
7    Q.   Generally just tell me what that was about?
8    A.   A loan that George made to Chillicothe
9  Construction, and they say -- and it wasn't repaid.
10   Q.   And that there was a judgment entered;
11 correct?
12   A.   Correct.
13   Q.   And that was for a series of promissory
14 notes?
15   A.   Yes.
16   Q.   To?
17   A.   Chillicothe Construction.
18   Q.   Well, from Chillicothe to --
19   A.   Yes.
20   Q.   To George's pension plan?
21   A.   Yes.
22   Q.   Have you made any payments towards this
23 judgment?
24   A.   No.

JENSEN REPORTING  (312) 236-6936

---

1    MR. INGRAM:  May I ask you a question?  I don't
2  believe that we have a copy of that complaint in that
3  case.
4    MR. BIELSKI:  I'll get it to you.  You just want
5  the complaint?
6    MR. INGRAM:  Well, the complaint and I suppose --
7    MR. BIELSKI:  I have a whole cabinet.  That's why
8  I'm asking.
9    MR. INGRAM:  I don't want the whole cabinet.
10 The complaint and the answer maybe.  Something like
11 that.
12   MR. BIELSKI:  Because there's three amended
13 complaints.  I suppose you want the last one.
14   MR. INGRAM:  Yes, the last one.  The one on which
15 the judgment was entered.
16   MR. BIELSKI:  I'll get you that and if there's
17 anything else you want, just shoot me an e-mail and
18 I'll get it to you.
19   MR. INGRAM:  I appreciate it.  Thank you.
20 BY MR. BIELSKI:
21   Q.   Has Greg Kulis represented you in that
22 case; correct?
23   A.   Yes.
24   Q.   Did he make -- does he have any claim for

JENSEN REPORTING  (312) 236-6936

---

60

1  attorney's fees that he claims you owe him?
2    A.   No.  I paid him.
3    Q.   The last line, Illinois Department of
4  Revenue, $156,059.51.  Do you see that?
5    A.   Yes.
6    Q.   Is that related to the disputes we've
7  discussed before?
8    A.   Yes.
9    Q.   So that's the same amount?  It's not a
10 different case?
11   A.   No, it's not a different case.
12   Q.   And then the last page, Macy's $5,665.  I'm
13 sorry, that's wife.  Go to Macy's, husband, $1,393.
14 Do you see that?
15   A.   Yes.
16   Q.   What is that for?
17   A.   Charge account.  Credit card.
18   Q.   Was anybody else on that account besides
19 you?
20   A.   No.
21   Q.   And the last one, Pickle Credit Services.
22 What is that?
23   A.   Credit card.
24   Q.   Anybody else on that account besides you?

JENSEN REPORTING  (312) 236-6936

63

1    A.   No.

2    Q.   If you look at the very bottom of that

3  page, it has $4,309,607.02.  Do you see that?

4    A.   Yes.

5    Q.   Is that an accurate reflection of the

6  claims against you, your wife, or both of you?

7    A.   Yes.

8    MR. BIELSKI:  Why don't we do this.  We've been

9  going at it about hour and ten minutes.  Take a quick

10  break.

11    MR. INGRAM:  Good idea.

12             (A short break was had.)

13  BY MR. BIELSKI:

14    Q.   Let's go to Schedule B.  Let the record

15  reflect I showed Schedule B to counsel.

16    MR. INGRAM:  You do know there's a couple more

17  pages.  Schedule B has three pages, or four pages.

18    MR. BIELSKI:  Let me pull it out.

19    MR. INGRAM:  There's 1 of 2 and 2 of 2.  You want

20  to borrow this?

21    MR. BIELSKI:  Yeah.  Let's just look at what you

22  have.

23    MR. INGRAM:  You wanted page 1, too.  I'll give

24  him page 1, too.

---

62

1  BY MR. BIELSKI:

2    Q.   So it's 1, 2, and 3.  Three pages; correct?

3    MR. INGRAM:  Right.

4    THE WITNESS:  There's two pages.

5    MR. INGRAM:  It's three.  What they do here is

6  give you the first page and it says two more pages to

7  follow, and this is NO. 1 of 2 and NO. 2 of 2

8  continuation sheets.

9    THE WITNESS:  Okay.

10  BY MR. BIELSKI:

11    Q.   Mr. Dempsey, do you recognize that

12  document?

13    A.   I do.

14    Q.   What is it?

15    A.   It's a Schedule B of personal property.

16    Q.   And I'm looking at the page where it starts

17  with cash and then it goes to checking account which I

18  see you're looking at now?

19    A.   Yes.

20    Q.   And at the very bottom it has $22,2444.  Do

21  you see that?

22    A.   Yes.

23    Q.   Is that an accurate statement of your

24  personal property?

---

1    MR. INGRAM:  As of page 1.

2  BY MR. BIELSKI:

3    Q.   As of page 1?

4    A.   Yes.

5    Q.   And then going to the second page there is

6  a listing I see of two corporations; is that correct?

7    MR. INGRAM:  Stock in two corporations.

8  BY MR. BIELSKI:

9    Q.   Fifty-five percent of Chillicothe.  Do you

10  see that?

11    A.   Yes.

12    Q.   And when you filed this bankruptcy action,

13  that's what you owned, 55 percent of Chillicothe?

14    A.   Yes.

15    Q.   Who owned the other 45 percent; do you

16  know?

17    A.   Charles Homolka, H O M O L K A.

18    Q.   What's your connection to Charles?

19    A.   Brother-in-law.

20    Q.   And how long has he owned 45 percent?

21    A.   Since 1978.

22    Q.   And then you have a value there of zero; is

23  that accurate?

24    A.   Yeah.

---

64

1    Q.   And then the next one is Demhoff

2  Corporation.  Do you see that?

3    A.   Yes.

4    Q.   And then you have zero next to that; too;

5  correct?

6    A.   Correct.

7    Q.   Is that your estimate of the value of

8  Demhoff?

9    MR. INGRAM:  That's the estimate of the value of

10  the stock in Demhoff.

11  BY MR. BIELSKI:

12    Q.   The value of the stock of Demhoff?

13    A.   Yes.

14    Q.   Has it always -- has it been zero for the

15  last four years, the value of that stock?

16    A.   No.

17    Q.   Well, when did it go to zero?

18    A.   Within the last 12 months.

19    Q.   Was there ever a value of that stock in the

20  last four years?

21    A.   Yes.

22    Q.   What was the value, say, at December 31,

23  '07?

24    MR. INGRAM:  The question is whether you could

1  have sold the stock to somebody in this company to

2  somebody else.

3  BY THE WITNESS:

4     A.   No, I could not have done that. It had no

5  value.

6     Q.   You could not sell it for the last four

7  years for more than zero?

8     A.   That's right.

9     Q.   And then go to the next page, please. And

10  then there's, Computer four years old, 500; correct?

11     A.   Yeah.

12     Q.   And the bottom line there is 22,744 on the

13  third page?

14     A.   Yes.

15     Q.   Is that the value of the personal property?

16     A.   Yes.

17     Q.   Is there any property that's not included

18  on Schedule B that should be?

19     A.   No.

20     Q.   Has Demhoff ever filed tax returns in the

21  last four years?

22     A.   No.

23     Q.   It has not?

24     A.   It has not.

---

1     Q.   Has Demhoff ever filed tax returns?

2     A.   Yes.

3     Q.   Was that through Jerry Sparks?

4     A.   Yes.

5     Q.   When was the last time that Demhoff filed a

6  tax return?

7     A.   I think 2003.

8     Q.   Has Chillicothe Construction Company filed

9  any returns in the last four years?

10     A.   No.

11     Q.   When's the last time Chillicothe filed a

12  return?

13     A.   I don't know, but I would say maybe ten

14  years ago.

15     Q.   Was that through Jerry Sparks?

16     A.   Yes.

17     Q.   Do you recognize the name Elizabeth Beck?

18     A.   Yes.

19     Q.   Who is Elizabeth Beck?

20     A.   Attorney.

21     Q.   Your attorney or attorney for somebody

22  else?

23     A.   Attorney for somebody else.

24     Q.   Who for?

---

1     A.   Linda Lou's.

2     Q.   I'm showing you what I marked as D308

3  through D332.

4     MR. INGRAM: I'm going to object to this one. I

5  can't see that there is any connection between this

6  and assets of the debtors' estate.

7  BY MR. BIELSKI:

8     Q.   Let me ask the question. It's the fourth

9  page from the end. No, I'm sorry. It looks like this

10  (indicating).

11     MR. INGRAM: This one?

12     MR. BIELSKI: Yeah, that's the one. What is that

13  D --

14     MR. INGRAM: Is it this one or this one? D319 or

15  D320.

16     MR. BIELSKI: D320.

17  BY MR. BIELSKI:

18     Q.   So D320, do you recognize these documents,

19  Mr. Dempsey?

20     A.   I've never seen them. But I understand

21  them.

22     Q.   Is this tax return of Linda Lou's?

23     MR. INGRAM: The question is do you recognize

24  them?

---

1  BY THE WITNESS:

2     A.   No.

3     Never seen tax returns from Linda Lou's?

4     A.   Yes.

5     Q.   Well, go to the very first page. Do you

6  recognize this document?

7     A.   Well, this one is '05 and this one is '06.

8     Q.   Can I see that again?

9     MR. INGRAM: This is not really a coherent

10  document because there's also in here pages that are

11  called 2004, 2005, and then there's 2006. This is --

12     MR. BIELSKI: Because these are in the exact

13  order I got them from your office.

14     MR. INGRAM: Well, let me point out that this

15  one, although it's dated 3-20-06, is for your ending

16  12-31-05.

17     MR. BIELSKI: So that's the '05 return.

18     MR. INGRAM: This is part of 2005.

19  BY MR. BIELSKI:

20     Q.   Just for the record, again, we're on D320

21  and it's titled Federal statements. Do you see that,

22  Mr. Dempsey?

23     A.   I do.

24     Q.   And you see where it says, Richard Dempsey,

**Page 69 (top left)**

1  121,500?
2     A.   Yes.
3     Q.   And that is loan from shareholders; is that
4  correct?
5     A.   Yes.
6     Q.   what was that loan for?
7     A.   For when they bought the business.
8     Q.   So Linda Lou's in 2005 owed you 121,000?
9     A.   In 1999.  when we purchased the property
10  owed me -- I don't think 121,000, but I may have put
11  some more money in it.
12     Q.   But in 2005 did Linda Lou's owe you
13  121,500?
14     A.   No.  Because those notes were -- those were
15  notes drawn up in '99 and they expired in '05.
16     Q.   Did you ever get paid for those notes?
17     A.   No.
18     Q.   So they expired with no payment?
19     A.   That's right.
20     Q.   So it's your testimony today that in the
21  last four years you've never been owed money from
22  Linda Lou's?
23     A.   I said in '05 those notes expired.
24     Q.   But in '06 were you owed any money from

**Page 70 (bottom left)**

1  Linda Lou's?
2     A.   No.  There's no documents on that there.
3  Those notes expired in '05.
4     Q.   In '07 were you owed any money?
5     A.   No.
6     Q.   How about '08?
7     A.   Linda Lou's did not owe me any money in
8  '07.
9     Q.   Did you have share certificates, actual
10  certificates for the stock for Linda Lou's?
11     A.   Yes.
12     Q.   They were never drafted up?
13     A.   They may have been drafted up, but I think
14  Elizabeth Beck kept the certificates.
15     Q.   So you've never seen them?
16     A.   I've never seen them.
17     Q.   Were you ever involved in a lawsuit titled,
18  Tamika Sprinkle v Amber Allen, Linda Lou's, and a
19  number of other parties, case No. 08 L 187  Were you
20  ever involved in a lawsuit with Linda Lou's?
21     A.   what date?
22     A.   It would have been an '08 case.  2008.
23     A.   Linda Lou's was involved, but I was not
24  involved.

**Page 71 (top right)**

1     Q.   But you were not personally involved in
2  that?
3     A.   No.
4     Q.   Showing you what's been marked as D448 and
5  D449.  Let's start with 448.  Do you recognize this
6  document?
7     A.   Yes.
8     Q.   what is it?
9     A.   Minutes of a meeting of Linda Lou's.
10     Q.   when was this meeting?
11     A.   which one are you looking at?
12     Q.   The first one, 448.
13     A.   The transfer of my stock from myself to
14  Linda Ellison in exchange for $40,000 debt that I owed
15  Linda Ellison.
16     Q.   who drafted these minutes?
17     A.   Linda Ellison.
18     Q.   And is that your signature?
19     A.   Yes.
20     Q.   And it's dated 12-7-07?
21     A.   Yes.
22     Q.   was anybody else at the meeting besides you
23  or Linda?
24     A.   No.

**Page 72 (bottom right)**

1     Q.   Is there any other minutes or any other
2  corporate records relating to this meeting other than
3  this?
4     A.   No.
5     Q.   And then the next one which is 449, I
6  believe, do you recognize that document?
7     MR. INGRAM:  You mean D449?  Okay.
8  BY MR. BIELSKI:
9     Q.   Do you recognize that document,
10  Mr. Dempsey?
11     A.   Yes.
12     Q.   what is that document?
13     A.   It's an agreement between me and Linda
14  Ellison to pay her $5,000 yearly bonus for managing
15  and operating Linda Lou's 119.
16     Q.   were any shares transferred on that meeting
17  in 2007, like physical shares transferred, or just on
18  this document?
19     A.   well, I instructed Elizabeth Beck to
20  transfer my 50 shares to Linda Ellison.
21     Q.   But you never physically hand --
22     A.   I never physically.  I signed the
23  documents.  I didn't see the documents.
24     Q.   That was all done through Elizabeth Beck?

1    A.   Yes.

2    Q.   And who drafted 4497

3    MR. INGRAM: I'm going to object to 449. I don't

4  see that it has anything to do with the assets of the

5  estate. This is a 1999 document of money that he

6  would owe to them. It does not have anything to do

7  with monies coming back to him.

8    MR. BIELSKI: I think it was pursuant to the

9  court order that all Linda Lou's documents are to be

10  produced.

11    MR. INGRAM: Right. But it's still irrelevant.

12    MR. BIELSKI: Fair enough. It was turned over,

13  so that's why we're looking at it. I'll ask the

14  question.

15  BY MR. BIELSKI:

16    Q.   Who drafted the document dated February 1,

17  1999?

18    A.   I think Linda Ellison.

19    Q.   You did not have any control over drafting

20  this document?

21    A.   No.

22    Q.   Did you ever have any interest in Greenhead

23  Hunting Club?

24    A.   Yes.

---

74

1    Q.   When did you have an interest in that

2  entity?

3    A.   Please repeat the question.

4    Q.   When did you have an interest in Greenhead

5  Hunting Club?

6    A.   When it was formed in 2006 and until 2008.

7    Q.   What kind of an entity is it?

8    A.   It's a hunting club. A corporation.

9    Q.   Corporation or LLC? Is it an LLC or a

10  corporation?

11    A.   It's an LLC.

12    Q.   So that's a limited liability company.

13    A.   Yes.

14    Q.   And what was the corporate purpose of that

15  entity?

16    A.   To purchase real estate and personal

17  property from the Demhoff Corporation.

18    Q.   How many membership interests did you own

19  in the LLC in 2006?

20    A.   Six.

21    Q.   And how about in 2007?

22    A.   Three.

23    Q.   What happened between 2006 and 2007?

24    A.   I sold three.

---

1    Q.   You sold three?

2    A.   Yeah.

3    Q.   You personally sold three?

4    A.   Demhoff Corporation sold three.

5    Q.   So it was owned by Demhoff?

6    A.   Yes.

7    Q.   Who was the membership sold to?

8    A.   The three?

9    Q.   Yes.

10    A.   Mike Sitterly, S I T T E R L Y; Kelly Page,

11  P A G E; and Jamie Trapp, T R A P P.

12    Q.   Do you recall how much those were sold for?

13    A.   Yes.

14    Q.   How much?

15    A.   For $153,846.

16    Q.   Each?

17    A.   Each.

18    Q.   Was that amount paid?

19    A.   Yes.

20    Q.   And did you personally receive any of that

21  money out of that transaction?

22    A.   Jamie Trapp paid his check out personally

23  to me. The other two were made out to Demhoff.

24    Q.   So Jamie paid you 153,000?

---

76

1    A.   Yeah.

2    Q.   Where's that money?

3    A.   It went into my account. He didn't

4  understand how I wanted the check made to Demhoff.

5  He already made the check out so I just cashed the

6  check.

7    Q.   Did you pay Demhoff the money back?

8    A.   I think I did, yes.

9    Q.   When did you pay them back?

10    A.   Oh, as soon as I got it.

11    Q.   It went back into the Demhoff account?

12    A.   I believe so.

13    Q.   What account?

14    A.   Bank of America.

15    Q.   That would have been in 2007?

16    A.   It could be Bank of America, but it could

17  also be -- I had an account down in Lacon, Illinois,

18  at that time.

19    Q.   What account in Lacon?

20    A.   First National Bank.

21    Q.   Is that account in Demhoff's name or your

22  name?

23    A.   I have one in each.

24    Q.   You have one in each?

77

```
 1      A.    Yeah.
 2      Q.    What happened to your personal account in
 3  Lacon?
 4      A.    Closed out about two years ago.
 5      Q.    How much money was in it when you closed it
 6  out?
 7      A.    Four hundred dollars, $300.
 8      Q.    Is the Demhoff account still there?
 9      A.    Yes.  I believe that Demhoff still has an
10  account there.  Probably less than $200.
11      Q.    Did you have any other accounts down in
12  Lacon or Peoria or Chillicothe?
13      A.    No.
14      Q.    Was any of the payments from that 153,000,
15  did any of that go to your son John?
16      A.    No.
17      Q.    You were down to three membership interests
18  in '07; correct?
19      A.    Correct.
20      Q.    Do you currently, or does Demhoff currently
21  own any membership interests?
22      A.    No.
23      Q.    What happened to those membership
24  interests?
```

JENSEN REPORTING  (312) 236-6936

79

```
 1      Q.    How about in '08?
 2      A.    '08 I was a member.
 3      Q.    Now you're not a member.  Do you have to
 4  pay to go back to that LLC?
 5      A.    I'm not a member.
 6      Q.    I understand that, but if you want to go
 7  hunt there in October, do you?
 8      A.    I'd have to pay $153,846.
 9      Q.    So you have no right to go to that land any
10  more?
11      A.    Right.  I'm a manager.  I do have a right
12  to go on the property.
13      Q.    You're still a manager?
14      A.    I'm not an equity owner or a member.
15      Q.    Did Demhoff get paid all of the payments
16  that were required in that 2006 transaction?
17      A.    They got paid for ten memberships.
18      Q.    So all those have been paid to date?
19      A.    Yes.
20      Q.    So no members owe Demhoff any money --
21      A.    No.
22      Q.    -- for Greenhead.  Do you get paid any
23  money to manage that property?
24      A.    No.
```

JENSEN REPORTING  (312) 236-6936

78

```
 1      A.    They had up to until December 8th of '08 to
 2  sell the memberships.  If they didn't sell them by
 3  then they went back to the Greenhead Hunting Club.
 4      Q.    Was there any agreements that specified
 5  that?
 6      A.    Yes.
 7      Q.    Written or oral?
 8      A.    Written.
 9      Q.    And were the membership shares given back
10  to Greenhead or what happened to those?
11      A.    Yeah.  They're back in Greenhead.
12      Q.    Do you have any interest in Greenhead
13  today?
14      A.    No.
15      Q.    Do you still hunt at Greenhead?
16      A.    No.
17      Q.    When's the last time you were at Greenhead?
18      A.    Last fall.
19      Q.    During duck season?
20      A.    Yeah.
21      Q.    So that would be October?
22      A.    November, yeah.
23      Q.    Do you pay any fees to hunt on that land?
24      A.    I did when I was a member.
```

JENSEN REPORTING  (312) 236-6936

80

```
 1      Q.    Have you ever got money to manage
 2  Greenhead?
 3      A.    No.
 4      Q.    Are there any other managers of Greenhead?
 5      A.    No.  One's enough.
 6      Q.    And so there's how many members currently
 7  that you manage?
 8      A.    There's ten.
 9      Q.    Ten members?
10      A.    I'm sorry.  There's nine members.  Nine
11  members.
12      Q.    You're not a member but you're a manager?
13      A.    Yeah.
14      Q.    And who are the members?
15      A.    I gave --
16      MR. INGRAM:  I object.  I can't possibly see how
17  that could be relevant to a 2004 examination.
18      MR. BIELSKI:  I'll ask you the question:  Are you
19  instructing him not to answer?
20      MR. INGRAM:  Well, if by not answering that we
21  can reduce the amount of time we spend on this
22  deposition.  Is there any possible relevance of
23  whether or not -- yes, I'm going to instruct him not
24  to answer.
```

JENSEN REPORTING  (312) 236-6936

81

1  BY MR. BIELSKI:

2     Q.  So, Mr. Dempsey, you're going to follow

3  your counsel's advice and not answer that question?

4     A.  Yes.

5     MR. BIELSKI:  I'm going to certify the question

6  for court review.

7          (Question was so certified.)

8  BY MR. BIELSKI:

9     Q.  Showing you what's been marked as D679.  I

10 did not cross that out.  That's how it came.  Is that

11 the promissory note you're referencing in Linda Lou's?

12    MR. INGRAM:  You mean the promissory note

13 between --

14    MR. BIELSKI:  Linda Lou's to Mr. Dempsey.

15    MR. INGRAM:  There's no indication that

16 Mr. Dempsey -- there's a selection of Demhoff

17 Corporation, but there's nothing here about

18 Mr. Dempsey.

19 BY MR. BIELSKI:

20    Q.  This notice to 2005, July 14, 2005, is

21 there another promissory note with you, individually

22 between you and Linda Lou's?

23    A.  No.

24    Q.  So the note was between Linda Lou's and

---

83

1     A.  Yeah.  It's a bank statement from the First

2  National Bank of Lacon.

3     Q.  Is this the Lacon account that you

4  referenced before?

5     A.  Yes.

6     Q.  Did Demhoff ever have an interest in this

7  particular account?

8     A.  No.

9     Q.  Did Demhoff ever transfer money to this

10 account?

11    A.  It could have.  I'm not sure if it did.

12    Q.  We're just going to go through the

13 statement in order.

14    MR. INGRAM:  Which one are you going to first?

15    MR. BIELSKI:  12-31-06.

16    MR. INGRAM:  Do you know the deed number?

17 12-31-05 or 12-31-06?

18    MR. BIELSKI:  '06.  About six pages ahead of

19 where you're at now.

20    MR. INGRAM:  12-31-06.  This is D721.

21 BY MR. BIELSKI:

22    Q.  Do you see where it's -- December 19, 2006,

23 $50,015.  Do you know what that deposit is?

24    A.  Wired to Chicago.  My Chicago account.

---

82

1  Demhoff?

2     A.  That was my understanding to begin with,

3  yes.

4     Q.  Did you ever talk to Linda as far as why

5  you were listed individually on the tax returns?

6     A.  No.  I never look at the tax return.

7     Q.  So is it your testimony you were never owed

8  personally the money.  It was Demhoff?

9     A.  I always thought it was Demhoff.

10    Q.  Just Demhoff?

11    A.  Yeah.

12    Q.  Showing you what's been marked as D773

13 titled, Letter of direction to transfer shares.  Do

14 you recognize this document, Mr. Dempsey?

15    A.  Yes.

16    Q.  What is it?

17    A.  It's me authorizing the transfer of my 50

18 shares of the Linda Lou's stock to Linda Ellison on

19 the 6th day of December of 2007.

20    Q.  So that was done at the meeting between you

21 and Linda?

22    A.  Yes.

23    Q.  Showing you what's been marked as D715

24 through D769.  Do you recognize this document?

---

84

1     Q.  You're looking at the next page which is

2  D722?

3     A.  Yeah.

4     Q.  Let's go to that page.  The third check

5  down you made a payment of $60,000 to Demhoff

6  Corporation on 12-7-06.  What was that for?

7     A.  Probably a loan repayment.

8     Q.  What kind of loan?

9     A.  Promissory note or something.

10    Q.  Well, do you recall what note it is?

11    A.  No, I don't.

12    Q.  Do you have any documents to support this

13 $60,000 payment?

14    A.  No.

15    Q.  The next one is 15,000 dated December 8,

16 '06.  What was that 15,000 paid for?

17    A.  Probably payment of debt.

18    Q.  That Demhoff owed you?

19    A.  I owed Demhoff.

20    Q.  And do you recall what document that's

21 related to?  What promissory notes or what agreements?

22    A.  No.

23    Q.  At the very bottom of the page there's,

24 looks like, Dempsey wire to CHI, which I imagine is

85

```
 1   Chicago; is that correct?
 2       A.   Yeah.
 3       Q.   Is that 50,000?
 4       A.   Yeah.
 5       Q.   What is that for?
 6       A.   Wired money up to my account.
 7       Q.   Which account did you wire to?
 8       A.   I would assume that would be Bank of
 9   America.
10       Q.   This is from your personal account to
11   Demhoff; is that correct?
12       A.   This is from my personal account to -- I
13   don't know.  I don't know if it's from my personal
14   account.  It could be my personal account up here
15   or my Demhoff account.  I don't know what account it
16   was wired to.  Doesn't have an account number on it.
17       Q.   I'm jumping ahead now to November 18, 2008,
18   probably a good 20 pages ahead, the Chase account.
19       A.   You're going too far.
20       MR. INGRAM:  It's the Chase account?
21       MR. BIELSKI:  It's tough to read.  It's page 104.
22   November, it looks like, 18, 2008 through December 15,
23   2008.
24       MR. INGRAM:  This is July through August.  What
```

87

```
 1   three or four months.  And then I moved it back here.
 2       Q.   Did that money stay with Chase the whole
 3   time?
 4       A.   No.  It's the Illinois Chase account.  I
 5   just changed my address.  It stayed in Chase.  That
 6   was my address at that time.
 7       Q.   This is payment from your personal account
 8   to Demhoff; correct?
 9       A.   Yes.
10       MR. INGRAM:  The record will reflect that this is
11   D750.
12       MR. BIELSKI:  Now we're going to go ahead 13
13   pages, and that's a statement dated August 29, 2008.
14       MR. INGRAM:  Dated what?
15       MR. BIELSKI:  August 29, 2008.  It looks like
16   this.  It's actually a --
17       MR. INGRAM:  August 28.  Let the record reflect
18   that this is D763.
19   BY MR. BIELSKI:
20       Q.   Mr. Dempsey, do you recognize that
21   document?
22       A.   Oh, this is my bank account at Burling
23   Bank, I believe.
24       Q.   And this is in your name?
```

86

```
 1   did you say it was?
 2       MR. BIELSKI:  This document here (indicating).
 3       MR. INGRAM:  What does this say?  November to
 4   December, so it's after this one.  Did you get it?
 5       THE WITNESS:  I think we're getting close.
 6       MR. INGRAM:  Is that November yet?
 7       THE WITNESS:  This is October 17 to November 18.
 8       MR. INGRAM:  One more.  You said November through
 9   December.  Here it is.
10       MR. BIELSKI:  Correct.  That's it.
11   BY MR. BIELSKI:
12       Q.   And go to the bottom.  It just looks like
13   two deposits, the second one is November 28, $1,000.
14   Do you see that?
15       A.   Yeah.
16       Q.   That was wired to Demhoff; is that correct?
17       A.   Yes.
18       Q.   I see in the second line at the end there's
19   Silver Springs, Florida?
20       A.   Yeah.
21       Q.   What is that?
22       A.   I had my account moved to Silver Springs,
23   Florida, and I was going to spend the winter down
24   there and had my Chase account moved down there for
```

88

```
 1       A.   Yes.
 2       Q.   Anybody else have an interest in this
 3   account?
 4       A.   No.
 5       Q.   And the very first one is, wire from
 6   Demhoff; correct?
 7       A.   Right.
 8       Q.   And $76.51?
 9       A.   Well, the wire's $1,000.
10       Q.   Okay.  I'm sorry.
11       A.   And then the 1,200.
12       Q.   And then if we go down, there's check 258
13   just about halfway down and it says, Sittler.  What is
14   that for?
15       A.   Eighty-seven dollars.
16       Q.   I think that is $202.50 withdrawal,
17   Sittler?
18       A.   I don't know.  I think that's an ATM
19   withdrawal.
20       Q.   ATM?
21       A.   Yeah.
22       Q.   What's that?
23       A.   Automated teller machine.  ATM.
24       Q.   Oh, ATM.  So why is there Sittler here?
```

89

```
1      A.   Well, that's where the ATM was.
2      Q.   So you're not paying Suttler?
3      A.   It's a $200 withdrawal and they charge you
4  $2.50.
5      Q.   You're not paying Suttler there?
6      A.   Well, Suttler Management manages the
7  building that we live in and the ATM was in the
8  building.
9      Q.   So you were not paying Suttler?
10     A.   No.  It's just a location of the ATM
11  machine.
12     Q.   Do you know who the management company is
13  at 2626 North Lakeview?
14     A.   The what?
15     Q.   The management company?
16     A.   No.  Are they the manager?  I'm sorry.
17  They are.
18     Q.   Suttler?
19     A.   Suttler manages the building, that's
20  correct.  I'm sorry.
21     Q.   Do you personally pay the assessments to
22  Suttler or is that through the landlord?
23     A.   No.  I pay it to the condo unit.
24     Q.   So the condo pays all the --
```

91

```
1  Do you know what that's from?  What account?
2      A.   No, I don't.  If I could guess.
3      MR. INGRAM:  You don't have to guess.
4  BY THE WITNESS:
5      A.   I don't know.
6      Q.   Jumping ahead to the statement dated -- I
7  got it reversed.  It's April 20th, 2006.  It's a
8  couple pages ahead.
9      MR. INGRAM:  This one?
10     MR. BIELSKI:  Actually, this one.  I think that's
11  it right there.
12  BY MR. BIELSKI:
13     Q.   There's three deposits there, $2,000,
14  $8,000, and another $8,000?
15     A.   Yes.
16     Q.   Do you know where those came from?
17     A.   No.
18     Q.   They're all internal transfer TLE credits;
19  is that correct?
20     A.   Correct.
21     Q.   You don't know if that came from Demhoff or
22  not?
23     A.   I do not.
24     Q.   Do you have any idea where they came from?
```

90

```
1      A.   Yeah.
2      Q.   I'm showing you what's been marked as D835
3  through D914.  Mr. Dempsey, do you recognize that
4  document?
5      A.   I do.
6      Q.   And what account is that?
7      A.   It's a bank account at LaSalle Bank in my
8  name.
9      Q.   Does anybody else own an interest in that
10  account in the last four years?
11     A.   No.
12     Q.   Let's jump to the next page, D --
13     MR. INGRAM:  D836.
14  BY MR. BIELSKI:
15     Q.   Do you see March 17, 2006, $5,000.  Do you
16  see that?
17     MR. INGRAM:  Where is that?
18     MR. BIELSKI:  I don't think you're on the same
19  statement.  Can I see that real quick?
20  BY MR. BIELSKI:
21     Q.   $5,000 deposit.  Do you know what that was
22  for, Mr. Dempsey?
23     A.   No.  Back in '06?
24     Q.   It says, Internal transfer, TLE credit.  Do
```

92

```
1      A.   No.
2      Q.   Jumping ahead to May 18, 2006.  What number
3  is that?  D841?
4      MR. INGRAM:  D841.
5  BY MR. BIELSKI:
6      Q.   And there's a deposit there of April 21,
7  '06, of 5,000 and on April 5th, 5,000.
8  April 11 -- I'm sorry.  May 11th, 2006, for 5,000.
9  And then May 16, 2006, for 4,000.  Do you see that?
10     A.   Yes.
11     Q.   Do you know where those came from?
12     A.   No.
13     Q.   Do you have any idea whether they came from
14  Demhoff?
15     A.   I don't know.
16     Q.   Jumping ahead to June 20th, 2006, about two
17  or three pages ahead.
18     MR. INGRAM:  843.
19  BY MR. BIELSKI:
20     Q.   June 6, 2006, $10,000.  Do you know where
21  that came from?
22     MR. INGRAM:  Where's that?
23     MR. BIELSKI:  It's the statement dated June 6,
24  2006.  You have to go one more page.
```

93

BY MR. BIELSKI:

Q.   In the middle of the page there, June 6, 2006, the internal -- do you know where that came from?

A.   No.

Q.   No idea if that came from Demhoff?

A.   I don't know.

Q.   How would I find that out, where it came from?

A.   I don't know if they have a record of that or not.

Q.   Do you have any records from that?

A.   I don't have any records.

Q.   Do you have any records for any of these deposits other than what we have here in front of us?

A.   No.

Q.   Going to August 18, 2006.

MR. INGRAM:   It's on 848.

BY THE WITNESS:

A.   August 18?

Q.   Jump one more page, actually.   D849?

A.   This is July.

MR. INGRAM:   That's July now?

MR. BIELSKI:   No.   We're on August 18, 2006.

94

MR. INGRAM:   So we have to go forward a little bit further.   August.   This is December.   These are not necessarily in order.

MR. BIELSKI:   You jumped ahead a few.   Again, I copied these the way I got them.   The August is before July for some reason in these stacks.

THE WITNESS:   Okay.

MR. INGRAM:   This is the one, I guess.

THE WITNESS:   I think this is the one he wants.

MR. INGRAM:   This is August the 18th here.

MR. BIELSKI:   And then the next page, so that one.

MR. INGRAM:   Is that the one you're looking for?

MR. BIELSKI:   Let me see it.   That's the one.   What reference is that?

MR. INGRAM:   That's D847.

BY MR. BIELSKI:

Q.   Looking at D847, there's an internal transfer TLE credit of August 2nd, 2006.   Do you know where that came from?

A.   No.

Q.   How about the August 8, 2006, deposit of 2,500?

A.   No.

95

Q.   We're jumping two pages ahead, which is dated July 21, 2006?

A.   Yes.

Q.   And June 29, 2006, $10,000 internal transfer TLE credit.   Do you know where that came from?

A.   No.

Q.   This is still your personal account; correct?

MR. INGRAM:   Yes.

BY THE WITNESS:

A.   Yes.

Q.   And then go down to July 17, 2006, $5,000.   Any idea where that came from?

A.   No.

Q.   We're going to jump three pages ahead to the statement dated -- I'm sorry.   December 20th of 2006?

MR. INGRAM:   Which version?

THE WITNESS:   This one here.   This one.   Nope.

MR. INGRAM:   I don't know which -- yeah, that's it right there.   D853.

BY MR. BIELSKI:

Q.   This is the statement dated December 20th,

96

2006, and there's three deposits at the bottom, 20,000 on December 7, '06; 20,000 on December 15, '06; and 50,000 on December 19, 2006.   There's $90,000.   Do you know where those deposits came from?

A.   No.

Q.   Staying on that page on December 11, 2006, it looks like Selective Progressive Insurance premium, total of $290.49?

A.   Yes.

Q.   What insurance policy is that?

A.   That was on insurance on the Tahoe.

Q.   That was through your agent again.   What was his name?

A.   No, I don't think that -- I think I got that on my own out of Florida.

Q.   So that was you paying the premium for a Tahoe that was owned by Demhoff; correct?

A.   Yeah.   Right.

Q.   I don't want to go back in time so we're going to jump number of pages.   Continue until you get to January 22, '07.   We're going to be skipping about 20 pages there.

MR. INGRAM:   Here's 1-31-07, is that what you're looking for?

99

1    MR. BIELSKI:  1-22-07.

2    MR. INGRAM:  Okay.

3    MR. BIELSKI:  Actually, skip to the 1-31-07.  Two

4 pages ahead.

5    MR. INGRAM:  1-31-07.  There's 1-31-07.  Now,

6 which page of 1-31-07?

7    MR. BIELSKI:  First one's fine.

8    MR. INGRAM:  That's D833.

9 BY MR. BIELSKI

10    Q.   I'm looking at a check No. 1106 dated

11 January 18, '07, for 100,000?

12    A.   Yeah.

13    Q.   Do you know what that was for?

14    MR. INGRAM:  That was a withdrawal.

15 BY MR. BIELSKI:

16    Q.   Do you know what that was for?

17    A.   No.  I'd have to look at that.

18    Q.   Do you have copies of those checks?

19    MR. INGRAM:  Wait a minute.  I'd like to point

20 out that we're now no longer in Mr. Richard Dempsey's

21 personal one.  This is Demhoff Corporation.  So,

22 again, I'm putting forth my objection that this is

23 irrelevant to the issues in this proceeding, unless

24 you show some connection.

98

1 BY MR. BIELSKI:

2    Q.   Did you personally receive 100,000 from

3 Demhoff on this date?

4    A.   I don't know.

5    Q.   You don't know?

6    A.   I don't know.

7    Q.   Going to the next page.  Back on Richard

8 Dempsey.

9    MR. INGRAM:  That last one was D883.

10    MR. BIELSKI:  Actually, let's go ahead to

11 May 18th, 2007.  It's about eight pages ahead.

12    MR. INGRAM:  What would be D892.

13 BY MR. BIELSKI:

14    Q.   Do you see the deposits dated May 3, 2007,

15 and May 7, 2007?

16    MR. INGRAM:  That would be 893.

17 BY MR. BIELSKI:

18    Q.   Do you see those deposits?

19    A.   Five thousand and 5,000?

20    Q.   Yes.

21    A.   And 1,227?

22    Q.   Yeah.

23    A.   Yes.

24    Q.   Do you know where they came from?

99

1    No.

2    Q.   They're all internal transfers, the 5,000

3 internal transfer TLE credit; correct?

4    A.   Yes.

5    Q.   Go two pages ahead to June 20th, 2007?

6    A.   Yes.

7    MR. INGRAM:  That's 895.

8 BY MR. BIELSKI:

9    Q.   And you see three different deposits of

10 $5,000?

11    A.   Yes.

12    Q.   May 24, 2007, May 30th, 2007, and June 15,

13 2007.  Do you see that?

14    A.   Yes.

15    Q.   Those are all internal transfer TLE

16 credits?

17    A.   Yes.

18    Q.   Do you know where they came from?

19    A.   No.

20    Q.   Do you have any knowledge that they came

21 from Demhoff?

22    A.   No.

23    Q.   Jumping ahead to the statement dated

24 September 21, 2007, on the second page?

100

1    MR. INGRAM:  It will be D899.

2 BY MR. BIELSKI:

3    Q.   You see the three deposits of $5,000?

4    A.   Yes.

5    Q.   Those are all internal transfer credits?

6    A.   Yes.

7    Q.   Do you know where those came from?

8    A.   No.

9    Q.   Jump ahead to October 19, 2007, second page

10 again?

11    MR. INGRAM:  That's D902.

12    MR. BIELSKI:  Thank you.

13 BY MR. BIELSKI:

14    Q.   September of 27, 2007, and October 9, 2007.

15 Do you see those two deposits for 5,000?

16    A.   Yes.

17    Q.   Again, internal transfer credit?

18    A.   Yes.

19    Q.   Do you know where they came from?

20    A.   No.

21    Q.   Do you know if they came from Demhoff?

22    A.   I don't know.

23    Q.   Jumping ahead to November 21, 2007.  We're

24 looking at D906.  Do you see a deposit of 5,000 on

101

1   October 22 of 2007?

2        A.   Yes.

3        Q.   Deposit November 1 of 2007 of 5,000.  Do

4   you see that?

5        A.   Yes.

6        Q.   Do you see a deposit for November 9, 2007,

7   of 2,000?

8        A.   Yes.

9        Q.   Do you see a deposit of November 15, 2007,

10  for 2,000?

11       A.   Yes.

12       Q.   Those are all internal transfer TLE

13  credits?

14       A.   Yes.

15       Q.   Do you know where those come from?

16       A.   No.

17       Q.   Jumping ahead to December 20th, 2007.

18  MR. INGRAM:  That would be D909.

19  BY MR. BIELSKI:

20       Q.   And the second page of that there's the

21  deposit of 2,000 on December 3, 2007.  Do you see

22  that?

23       A.   Yes.

24       Q.   Do you see a deposit of 1,000 on

---

102

1   December 11, 2007, $1,000?

2        A.   Yes.

3        Q.   And deposit of 1,000 on December 17th,

4   2007?

5        A.   Yes.

6        Q.   Do you know where those come from?

7        A.   No.

8        Q.   Jumping about three or four pages ahead to

9   January 22, '08?

10  MR. INGRAM:  It would be D913.

11  BY MR. BIELSKI:

12       Q.   There's a series of deposits, internal

13  transfer TLE credit, $1,000 on December 27, 2007.  Do

14  you see that?

15       A.   Yes.

16       Q.   December 31 '07?

17       A.   Yes.

18       Q.   January 4, '08?

19       A.   Yes.

20       Q.   January 7, '08.  Do you see those?

21       A.   Yes.

22       Q.   Do you know where those come from?

23       A.   No.

24  MR. INGRAM:  It is getting late.  Mrs. Dempsey

---

103

1   would like to take a short break at this time, and

2   let's make it very short.

3        MR. BIELSKI:  Less than five minutes.

4                 (A short break was had.)

5   BY MR. BIELSKI:

6        Q.   Mr. Dempsey, have you ever used Trupay?

7        A.   What?

8        Q.   Do you ever use Trupay, T R U pay?

9   Electronic payment service?  What I mean ever, in the

10  last four years have you used Trupay?

11       A.   I don't think so.

12       Q.   Ever a Paypal or any kind of electronic

13  service like that?

14       A.   No.  I don't believe so.  I don't remember.

15       Q.   This one I don't have marked.  It's the tax

16  returns.

17       MR. INGRAM:  Tax returns for --

18       MR. BIELSKI:  Mr. Dempsey, you want me to

19  start --

20       MR. INGRAM:  Yeah.  Shall we put a mark on it?

21       MR. BIELSKI:  I'm pretty sure they were marked

22  before.  So why don't we just put, I don't know -- the

23  last one is D1057.  Do you want me to start again?

24       MR. INGRAM:  D what?

---

104

1        MR. BIELSKI:  This one would be D1058.  You want

2   me to mark it as I hand them to him?

3        MR. INGRAM:  Well, okay.  That might be a good

4   idea to do that.  What year is that?

5        MR. BIELSKI:  2005.

6        MR. INGRAM:  Okay.

7        MR. BIELSKI:  So that's D1058 to D1062, and

8   that's the tax returns for Mr. Dempsey.

9   BY MR. BIELSKI:

10       Q.   Let me ask him, do you recognize this

11  document?

12       A.   Yes.

13       Q.   And what is this document?

14       A.   2005 tax return.

15       Q.   And so in 2005 you made $6,439.  That's

16  your income for that year?

17       A.   Yes.

18       Q.   And this return is prepared by Jerry

19  Sparks; correct?

20       A.   Correct.

21       Q.   What was the last page on that?  D1062?

22       A.   1062.

23       Q.   The section I marked, admittedly this mark

24  on the first page is made by me and that highlight is

105

1  done by me. It's D1063 through D1070. Mr. Dempsey,
2  do you recognize that document?
3      A.  Yes.
4      Q.  What is that document?
5      A.  It's a 2006 tax return for myself.
6      Q.  You can go forward to D1066. Actually,
7  it's 65. That's it right there, D1065. And do you
8  see where it says Double Chuck Farms, 100,000?
9      A.  Yes.
10     Q.  What is Double Chuck Farms?
11     A.  It was a hunting club I had an equity
12  interest in and I sold it.
13     Q.  And was that sold in 2006?
14     A.  Yes.
15     Q.  Where was Double Chuck Farms?
16     A.  In Canton, Illinois.
17     Q.  And you owned a membership interest or
18  shareholder?
19     A.  I had a shareholder interest in it.
20     Q.  Do you currently have any shareholder
21  interest in Double Chuck Farms?
22     A.  No.
23     MR. INGRAM:  Excuse me. I think the name is
24  Double Cluck.

JENSEN REPORTING  (312) 236-6936

106

1  BY MR. BIELSKI:
2      Q.  Double Cluck?
3      A.  Yeah. Double Cluck.
4      Q.  So that was a hunting club?
5      A.  Yes.
6      Q.  Were you the only owner or was there other?
7      A.  No. There were several owners.
8      Q.  Is that entity still in existence?
9      A.  Yes.
10     Q.  Do you have any connection as a manager or
11  officer in that entity?
12     A.  No.
13     Q.  Were you ever an officer or director of
14  that entity?
15     A.  No.
16     Q.  Did you ever have any interest in any other
17  hunting clubs in the last four years other than that
18  what you just mentioned, Double --
19     MR. INGRAM:  Double Cluck.
20  BY MR. BIELSKI:
21     Q.  Double Cluck or any other?
22     A.  No.
23     Q.  Did you ever give any testimony in the case
24  City Bank v Eileen Dempsey?

JENSEN REPORTING  (312) 236-6936

107

1      A.  Concerning what?
2      Q.  Did you ever give any testimony in the case
3  City Bank v Eileen M. Dempsey?
4      A.  No.
5      Q.  Did you ever give any testimony in American
6  Express v Richard Dempsey?
7      A.  No.
8      MR. BIELSKI:  Let me just meet with him and then
9  we'll wrap it up.
10
11                (A short break was had.)
12  BY MR. BIELSKI:
13     Q.  Have you ever lived at 1180 Southeast 172nd
14  Avenue in Silver Springs, Florida?
15     A.  That was a place I was going to spend the
16  winter. I never lived there. I stayed there several
17  times, but I never lived there.
18     Q.  Did you ever have any ownership interest in
19  that property?
20     A.  No.
21     Q.  Did you ever have any lease interest in
22  that property?
23     A.  No.
24     Q.  Did you ever list any bank accounts under
     that property's address?

JENSEN REPORTING  (312) 236-6936

108

1      A.  I moved my account that I had in Chicago
2  down there.
3      Q.  And then you put it under that address?
4      A.  Under that address, yeah.
5      Q.  Do you know who lives there?
6      A.  Yeah.
7      Q.  Who?
8      A.  Mike Milligan.
9      Q.  Are they the owner of that property?
10     A.  Yes.
11     Q.  How do you know Mike?
12     A.  A friend of mine for 30 years.
13     Q.  But you never lived there?
14     A.  No, I never lived there. I stayed with
15  him, but I never lived there.
16     MR. BIELSKI:  I don't have any further questions.
17     MR. INGRAM:  Now I've got three hours.
18     MR. BIELSKI:  Reserved?
19     MR. INGRAM:  Reserved. Thank you very much.
20     THE COURT REPORTER:  Do you want this?
21     MR. BIELSKI:  Yes. No rush. Can you do it small
22  form? Condensed?
23     THE COURT REPORTER:  Yes.
24     MR. INGRAM:  We are probably not going to order a

JENSEN REPORTING  (312) 236-6936

---

**109**

1  transcript immediately. And if we are going to go
2  further with anything, then at that time we can order
3  the transcript.
4      MR. BIELSKI: I'll keep all of the exhibits.
5          (Witness excused.)

---

**110**

    IN THE UNITED STATES BANKRUPTCY COURT
    FOR THE NORTHERN DISTRICT OF ILLINOIS
           EASTERN DIVISION

In re the matter of    )
               )  CHAPTER 7
RICHARD RYAN DEMPSEY and )
EILEEN M. DEMPSEY,     )
    vs.           )  NO. 08 B 33951
         Debtors,  )  JUDGE JACQUELINE P. COX

    I, RICHARD DEMPSEY, state that I have read
the foregoing transcript of the testimony given by me
at my deposition on the 7th day of May, 2009, and that
said transcript constitutes a true and correct record
of the testimony given by me at the said deposition
except as I have so indicated on the errata sheets
provided herein.

          _____
          Richard Dempsey

No corrections (Please initial)_____
Number of errata sheets submitted_____(pgs.)

SUBSCRIBED AND SWORN to
before me this ____ day
of _____, 2009.

    _____
    NOTARY PUBLIC

---

**111**

STATE OF ILLINOIS )
             ) SS.
COUNTY OF LaSALLE )

    I, Kelly A. Siska, Certified Shorthand
Reporter and Notary Public, do hereby certify that on
the 7th day of May, A.D., 2009, the deposition of the
witness, RICHARD DEMPSEY, called by the Claimant, was
taken before me, reported stenographically, and was
thereafter reduced to typewriting under my direction.
    The said deposition was taken at the offices
of Messer & Stilp, Ltd., Suite 300, 166 West
Washington Street, Chicago, Illinois, and there were
present counsel as previously set forth.
    The said witness, RICHARD DEMPSEY, was first
duly sworn to tell the truth, the whole truth, and
nothing but the truth, and was then examined upon oral
interrogatories.
    I further certify that the foregoing is a
true, accurate, and complete record of the questions
asked of and answers made by the said witness,
RICHARD DEMPSEY, at the time and place hereinabove
referred to.

---

**112**

    The signature of the witness,
RICHARD DEMPSEY, was reserved by agreement of counsel.
    The undersigned is not interested in the
within case, nor of kin or counsel to any of the
parties.
    Witness my official signature and seal as
Notary Public in and for LaSalle County, Illinois, on
this 25th day of May, A.D., 2009.

          _____
          KELLY A. SISKA, CSR
          205 West Randolph Street
          Suite 510
          Chicago, Illinois 60606
          Phone: (312) 236-6936

CSR No. 084-002761

| A. | U.S. Department of Housing and Urban Development<br>Settlement Statement | B. Type of Loan | | |
|---|---|---|---|---|
| | ATTORNEYS' TITLE GUARANTY FUND, INC | 1. ☐ FHA   2. ☐ FmHA   3. ☐ Conv Unins | | |
| | 1 South Wacker 24th Floor Chicago, IL 60606-4654 (312) 372-8361 | 2408 Windsor Place P.O. Box 9136 Champaign, IL 61826-9136 (217) 359-2000 | 2500 South Highland Ave Suite 330 Lombard, IL 60148-5363 (630) 627-7441 | 120 West Main Street Suite 115 Belleville, IL 62220-1554 (618) 277-0440 | 4. ☐ VA   5. ☐ Conv Ins.   6. ☐ Seller Finance |
| | | | | | 6. File Number<br>060042500261   7. Loan Number |
| | | | | | 8. Mortgage Ins Case Number |

C.  Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes only and are not included in the totals.

| D. Name and Address of Borrower | E. Name, Address, and Tax ID Number of Seller | F. Name and Address of Lender |
|---|---|---|
| The Greenhead Hunting Club, LLC.<br>c/o John Connelly<br>576 Royalwood<br>Valparaiso  IN 46385 | Demkoff Corp., an Illinois Corporation<br>2626 N. Lakeview, Apt 703<br>Chicago  IL 60614 | NONE |

| G. Property Location (Complete address, including legal description, if necessary)<br><br>NW 1/4 & W 1/2 SW 1/4 Section 10, Partridge Township, Woodford County, Illinois | H. Settlement Agent Name, Address and Tax ID Number<br>Elizabeth Beck<br>310 Fifth Street<br>Lacon, IL 61540<br>Tax ID:<br>**Closer: MEMBER CLOSER** | |
|---|---|---|
| | Place of Settlement<br>Elizabeth Beck<br>310 Fifth Street<br>Lacon, IL 61540 | I. Settlement Date<br>12/6/2006<br>Fund: |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| 100. Gross Amount Due from Borrower | | 400. Gross Amount Due to Seller | |
| 101. Contract Sales Price | $1,850,000.00 | 401. Contract Sales Price | $1,850,000.00 |
| 102. Personal Property | $150,000.00 | 402. Personal Property | $150,000.00 |
| 103. Settlement Charges to borrower | | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. County property taxes | | 406. County property taxes | |
| 107. County property taxes | | 407. County property taxes | |
| 108. Special Assessment | | 408. Special Assessment | |
| 109. Homeowner Asc Dues | | 409. Homeowner Asc Dues | |
| 110. Flood insurance | | 410. Flood insurance | |
| 111. Other taxes | | 411. Other taxes | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 116. | | 416. | |
| 120. Gross Amount Due From Borrower | $2,000,000.00 | 420. Gross Amount Due to Seller | $2,000,000.00 |
| 200. Amounts Paid By Or in Behalf Of Borrower | | 500. Reductions In Amount Due to Seller | |
| 201. Deposit or earnest money | $710,000.00 | 501. Excess Deposit | |
| 202. Principal amount of new loan(s) | | 502. Settlement Charges to Seller (line 1400) | $28,590.66 |
| 203. Existing loan(s) taken subject to | | 503. Existing Loan(s) Taken Subject to | |
| 204. Loan Amount 2nd Lien | | 504. Payoff of first mortgage loan | $190,000.00 |
| 205. Callahan Note | $93,846.00 | 505. Payoff of second mortgage loan | |
| 206. Nelson Note | $53,846.00 | 506. Earnest money | $710,000.00 |
| 207. 6 Units Greenhead Hunting Club, LLC. | $923,078.00 | 507. Callahan Note | $93,846.00 |
| 208. | | 508. Nelson Note | $53,846.00 |
| 209. | | 509. 6 Units Greenhead Hunting Club, LLC | $923,078.00 |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. County property taxes | | 510. County property taxes | |
| 211. County property taxes | | 511. County property taxes | |
| 212. Special Assessment | | 512. Special Assessment | |
| 213. Homeowner Asc Dues | | 513. Homeowner Asc Dues | |
| 214. Flood insurance | | 514. Flood insurance | |
| 215. Other taxes | | 515. Other taxes | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total Paid By/For Borrower | $1,780,770.00 | 520. Total Reduction Amount Due Seller | $1,999,360.66 |
| 300. Cash At Settlement From/To Borrower | | 600. Cash At Settlement To/From Seller | |
| 301. Gross Amount due from borrower (line 120) | $2,000,000.00 | 601. Gross Amount due to seller (line 420) | $2,000,000.00 |
| 302. Less amounts paid by/for borrower (line 220) | $1,780,770.00 | 602. Less reductions in amt. due seller (line 520) | $1,999,360.66 |
| | | | $639.34 |
| 303. Cash From Borrower | $219,230.00 | 603. Cash To Seller | |

Previous Edition is Obsolete                                        Printed at: 2:19 PM December 04, 2006 HUD-1 (



EXHIBIT
D

Blumberg No. 5119

| L. Settlement Charges | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|
| 700. Total Sales/Broker's Commission based on price | $0.00 | @ % = $0.00 | | |
| Division of Commission (line 700) as follows: | | | | |
| 701. | to | | | |
| 702. | to | | | |
| 703. Commission Paid at Settlement | | | $0.00 | $0.00 |
| 800. Items Payable In Connection with Loan | | | | |
| 801. Loan Origination Fee  Percent | to | | | |
| 802. Loan Discount | to | | | |
| 803. Appraisal Fee | to | | | |
| 804. Credit Report | to | | | |
| 805. Lender's Inspection Fee | to | | | |
| 806. Application Fee | to | | | |
| 807. Assumption Fee | to | | | |
| 808. Document Preparation Fee | to | | | |
| 809. Tax Service Fee | to | | | |
| 810. Flood Certification Fee | to | | | |
| 900. Items Required by Lender To Be Paid in Advance | | | | |
| 901. Interest from      to      @ /day | | | | |
| 902. Mortgage Ins Premium for  months      to | | | | |
| 903. Hazard Ins Premium for years      to | | | | |
| 1000. Reserves Deposited With Lender | | | | |
| 1001. Hazard insurance | months @ | per month | | |
| 1002. Mortgage insurance | months @ | per month | | |
| 1003. County property taxes | months @ | per month | | |
| 1004. County property taxes | months @ | per month | | |
| 1005. Special Assessment | months @ | per month | | |
| 1006. Homeowner Ass Dues | months @ | per month | | |
| 1007. Flood insurance | months @ | per month | | |
| 1008. Other taxes | months @ | per month | | |
| 1011. Aggregate Reserve Adjustment | | | | |
| 1100. Title Charges | | | | |
| 1101. Settlement or closing fee | to | | | |
| 1102. EPL Endorsement | to | | | |
| 1103. ARM Endorsement | to | | | |
| 1104. Condo Endorsement | to | | | |
| 1105. Location Note | to | | | |
| 1106. Buyer's Attorney fees | to      William Campbell | POC | | |
| 1107. Seller's Attorney fees | to      Elizabeth Beck | | | $6,310.00 |
| (includes above items numbers: | | | | |
| 1108. Title Charges | to ATG/Elizabeth Beck | ) | | $14,800.00 |
| (includes above items numbers: | | ) | | |
| 1109. Lender's coverage | $0.00 / $0.00 | | | |
| 1110. Owner's coverage | $1,850,000.00 / $14,890.00 | | | |
| 1200. Government Recording and Transfer Charges | | | | |
| 1201. Recording Fee – Deed      Deed $38.00      ; Mortgage $43.00      ; Releases $38.00 | | | | $119.00 |
| 1202. County tax stamps      Deed $925.00      ; Mortgage      to Woodford County Recorder | | | | $925.00 |
| 1203. State tax stamps      Deed $1,850.00      ; Mortgage      to Woodford County Recorder | | | | $1,850.00 |
| 1204. City tax stamps | to | | | |
| 1205. Record Assignment of Mortgage | to | | | |
| 1206. Release Status Verification Fee | to | | | |
| 1207. State Regulatory Fee | to      ATG Fees and Transfers | | $0.00 | $6.00 |
| 1300. Additional Settlement Charges | | | | |
| 1301. Survey | to      Forth & VanDyke | | | $3,500.00 |
| 1302. Costs advanced for Seller | to      Elizabeth Beck | | | $1,080.66 |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | | | | $28,590.66 |

12/17/08 10:59AM

B6C (Official Form 6C) (12/07)

In re    **Richard Ryan Dempsey,**
         **Eileen M. Dempsey,**

Case No. ___**08-33951**___

Debtors

# SCHEDULE C - PROPERTY CLAIMED AS EXEMPT - AMENDED

Debtor claims the exemptions to which debtor is entitled under:
(Check one box)
☐ 11 U.S.C. §522(b)(2)
☒ 11 U.S.C. §522(b)(3)

☐ Check if debtor claims a homestead exemption that exceeds
$136,875.

| Description of Property | Specify Law Providing Each Exemption | Value of Claimed Exemption | Current Value of Property Without Deducting Exemption |
|---|---|---|---|
| **Cash on Hand** | | | |
| Cash | 735 ILCS 5/12-1001(b) | 200.00 | 200.00 |
| **Checking, Savings, or Other Financial Accounts, Certificates of Deposit** | | | |
| Acct. No.000000794552711 Chase Bank | 735 ILCS 5/12-1001(b) | 1,600.00 | 1,600.00 |
| Acct. No. 484725 Burling Bank | 735 ILCS 5/12-1001(b) | 77.00 | 77.00 |
| Acct. 794553081 Chase Bank | 735 ILCS 5/12-1001(b) | 140.00 | 140.00 |
| **Security Deposits with Utilities, Landlords, and Others** | | | |
| Commonwealth Edison | 735 ILCS 5/12-1001(b) | 100.00 | 100.00 |
| **Books, Pictures and Other Art Objects; Collectibles** | | | |
| Pictures | 735 ILCS 5/12-1001(b) | 200.00 | 200.00 |
| **Wearing Apparel** | | | |
| Necessary wearing apparel | 735 ILCS 5/12-1001(a) | 500.00 | 500.00 |
| **Furs and Jewelry** | | | |
| Wedding rings | 735 ILCS 5/12-1001(b) | 1,000.00 | 1,000.00 |
| **Firearms and Sports, Photographic and Other Hobby Equipment** | | | |
| Shotgun | 735 ILCS 5/12-1001(b) | 500.00 | 500.00 |
| **Interests in Insurance Policies** | | | |
| Cash surrender value of whole life policy with Metropolitan Life Insurance Policy NB01905669 P.O. Box 544 Warwick, RI 02887-0544 | 215 ILCS 5/238 | 16,849.00 | 16,849.00 |
| **Stock and Interests in Businesses** | | | |
| 55% stock in Chilicothe Construction Company | 735 ILCS 5/12-1001(b) | 0.00 | 0.00 |
| Demhoff Corporation 2626 N. Lakeview, Apt. 1303 Chicago, IL 60614 | 735 ILCS 5/12-1001(b) | 0.00 | 0.00 |
| **Other Contingent and Unliquidated Claims of Every Nature** | | | |
| Contingent judgment of $30,000 against George McCarthy for $30,000, if he sells house. (Defendant has no present intention of selling house for years.) | 735 ILCS 5/12-1001(b) | 0.00 | 0.00 |
| **Office Equipment, Furnishings and Supplies** | | | |
| Computer--4 yrs. old | 735 ILCS 5/12-1001(d) | 500.00 | 500.00 |

EXHIBIT E
Blumberg No. 5119

| | | Total: | 21,666.00 | 21,666.00 |

___0___  continuation sheets attached to Schedule of Property Claimed as Exempt

Copyright (c) 1996-2008 - Best Case Solutions - Evanston, IL - (800) 492-8037

Best Case Bankruptcy

#1

Form A293

## PROMISSORY NOTE

$ 50,000 00 AND 00/100          Dated: AUGUST 12 , 19 90

Principal Amount FIFTY THOUSAND AND State of ILLINOIS
00/100

FOR VALUE RECEIVED, the undersigned hereby jointly and severally promise to pay to the
order of KHALSA CORPORATION PROFIT SHARING PLAN ████████
(FORMERLY HUNT FORT CORPORATION PROFIT SHARING PLAN)              , the sum of

Dollars ($ 50,000 00 AND 00/100 ), together with interest thereon at the rate of 10 %
per annum on the unpaid balance. Said sum shall be paid in the manner following:

PRINCIPAL PLUS INTEREST PAYABLE IN FULL ON 08/12/95

All payments shall be first applied to interest and the balance to principal. This note may be
prepaid, at any time, in whole or in part, without penalty. All prepayments shall be applied in reverse order
of maturity.

This note shall at the option of any holder hereof be immediately due and payable upon the failure to
make any payment due hereunder within                              days of its due date.

In the event this note shall be in default, and placed with an attorney for collection, then the
undersigned agree to pay all reasonable attorney fees and costs of collection. Payments not made within five
(5) days of due date shall be subject to a late charge of              % of said payment. All payments
hereunder shall be made to such address as may from time to time be designated by any holder hereof.

The undersigned and all other parties to this note, whether as endorsers, guarantors or sureties, agree
to remain fully bound hereunder until this note shall be fully paid and waive demand, presentment and protest
and all notices thereto and further agree to remain bound, notwithstanding any extension, renewal,
modification, waiver, or other indulgence by any holder or upon the discharge or release of any obligor
hereunder or to this note, or upon the exchange, substitution, or release of any collateral granted as security
for this note. No modification or indulgence by any holder hereof shall be binding unless in writing; and any
indulgence on any one occasion shall not be an indulgence for any other or future occasion. Any modification
or change of terms, hereunder granted by any holder hereof, shall be valid and binding upon each of the
undersigned, notwithstanding the acknowledgement of any of the undersigned, and each of the undersigned does
hereby irrevocably grant to each of the others a power of attorney to enter into any such modification on their
behalf. The rights of any holder hereof shall be cumulative and not necessarily successive. This note shall
take effect as a sealed instrument and shall be construed, governed and enforced in accordance with the laws of
the State first appearing at the head of this note. The undersigned hereby execute this note as principals and
not as sureties.

Signed in the presence of:
                                        CHILICOTHE CONSTRUCTION CO, INC
                                        15 W 154 60TH ST
_____                 BURR RIDGE, IL 60521
Witness
                                        Richard Dempsey - Treasurer
                                        Borrower

_____                 _____
Witness                                 Borrower

## GUARANTY

We the undersigned jointly and severally guaranty the prompt and punctual payment of all monies
due under the aforesaid note and agree to remain bound until fully paid.

In the presence of:
                                        CHILICOTHE CONSTRUCTION CO, INC
                                        15 W 154 60TH ST.
_____                 BURR RIDGE IL 60521
Witness
                                        Richard Dempsey - Treasurer
                                        Borrower

_____                 _____
Witness                                 Borrower

© E-Z Legal Forms. Before you use this form, read it, fill in all blanks, and make whatever changes are necessary
to your particular transaction. Consult a lawyer if you doubt the form's fitness for your purpose and use. E-Z Legal
Forms and the retailer make no representation or warranty, express or implied, with respect to the merchantability of
this form for an intended use or purpose.

(Revised 3/93)

0 53926 20293 5



EXHIBIT
F

Blumberg No. 5119

PROMISSORY NOTE
(Illinois)

GEORGE E. COLE®
LEGAL FORMS

Doc. 147
APRIL, 1990

CAUTION: Consult a lawyer before using or acting under this form. All warranties, including merchantability and fitness, are excluded.

$ _50,000 00_        FIFTY THOUSAND 00/100 ,     8-12      19 90

CHILLICOTHE CONSTRUCTION CO. INC after date 8/12/95 promise to pay to

the order of _HUNTFORT CORPORATION PROFIT SHARING PLAN_

_FIFTY THOUSAND AND_                                00/100 Dollars

Payable at _AFTER  8-12-95_

Value received with interest at _10_ % per annum.

No. _1_        Due _8-12-95_        CHILLICOTHE CONSTRUCTION CO. INC

Address _15 W 154 60th ST_
_BURR RIDGE ILLINOIS 60521_ BY Richard Dempsey - TREASURER

Form A293

# PROMISSORY NOTE

$ 50,000 ⁰⁰

Dated: *August 12* , 19 *90*

Principal Amount *Fifty Thousand*
*No 00/100*

State of *Illinois*

FOR VALUE RECEIVED, the undersigned hereby jointly and severally promise to pay to the order of
*Khalsa Corporation Profit Sharing Plan* ~~Withdrawn~~
*(Formerly Hunisco Corporation Profit Sharing Plan*

, the sum of *Fifty Thousand*

Dollars ($ *50,000 ⁰⁰* ), together with interest thereon at the rate of *10* % per

annum on the unpaid balance. Said sum shall be paid in the manner following:

*Principal plus interest payable in full on August 12, 2000)*

All payments shall be first applied to interest and the balance to principal. This note may be prepaid, at any time, in whole or in part, without penalty. All prepayments shall be applied in reverse order of maturity.

This note shall at the option of any holder hereof be immediately due and payable upon the failure to make any payment due hereunder within _____ days of its due date.

In the event this note shall be in default, and placed with an attorney for collection, then the undersigned agree to pay all reasonable attorney fees and costs of collection. Payments not made within five (5) days of due date shall be subject to a late charge of _____ % of said payment. All payments hereunder shall be made to such address as may from time to time be designated by any holder hereof.

The undersigned and all other parties to this note, whether as endorsers, guarantors or sureties, agree to remain fully bound hereunder until this note shall be fully paid and waive demand, presentment and protest and all notices thereto and further agree to remain bound, notwithstanding any extension, renewal, modification, waiver, or other indulgence by any holder or upon the discharge or release of any obligor hereunder or to this note, or upon the exchange, substitution, or release of any collateral granted as security for this note. No modification or indulgence by any holder hereof shall be binding unless in writing; and any indulgence on any one occasion shall not be an indulgence for any other or future occasion. Any modification or change of terms, hereunder granted by any holder hereof, shall be valid and binding upon each of the undersigned, notwithstanding the acknowledgment of any of the undersigned, and each of the undersigned does hereby irrevocably grant to each of the others a power of attorney to enter into any such modification on their behalf. The rights of any holder hereof shall be cumulative and not necessarily successive. This note shall take effect as a sealed instrument and shall be construed, governed and enforced in accordance with the laws of the State first appearing at the head of this note. The undersigned hereby execute this note as principals and not as sureties.

ned in the presence of:

_Gene J MacCarthy_
ness

_____

ness

*Chillicothe Construction Company*
*15 W 154 60th St*
*Burr Ridge, IL 60521*
*Richard Dempsey, President*

X _Richard Dempsey - President_
Borrower

_____
Borrower

## GUARANTY

We the undersigned jointly and severally guaranty the prompt and punctual payment of all moneys due r the aforesaid note and agree to remain bound until fully paid.

e presence of:

_Gene J MacCarthy_
ess

_____

ess

*Chillicothe Construction Company*
*15 W 154 60th St*
*Burr Ridge IL 60521*
*Richard Dempsey, President*

X _Richard Dempsey - President_
Guarantor

_____
Guarantor



20293   5

© E-Z Legal Forms. Before you use this form, read it, fill in all blanks, and make whatever changes are necessary to your particular transaction. Consult a lawyer if you doubt the form's fitness for your purpose and use. E-Z Legal Forms and the retailer make no representation or warranty, express or implied, with respect to the merchantability of this form for an intended use or purpose.
(Revised 1/93)

EXHIBIT
G

*#2*

Form A293

# PROMISSORY NOTE

$50,000 °° AND °°/°°      Dated: AUGUST 24, 1990

Principal Amount FIFTY THOUSAND    State of  ILLINOIS
AND 00/00

FOR VALUE RECEIVED, the undersigned hereby jointly and severally promise to pay to the order of KHALSA CORPORATION PROFIT SHARING PLAN ~~to 1600~~
(FORMERLY HUNT/OGT CORPORATION PROFIT SHARING PLAN) , the sum of

Dollars ($50,000 °° AND °°/100 ), together with interest thereon at the rate of     %
per annum on the unpaid balance. Said sum shall be paid in the manner following:

PRINCIPAL PLUS INTEREST PAYABLE IN FULL ON 08/24/95

All payments shall be first applied to interest and the balance to principal. This note may be prepaid, at any time, in whole or in part, without penalty. All prepayments shall be applied in reverse order of maturity.

This note shall at the option of any holder hereof be immediately due and payable upon the failure to make any payment due hereunder within     days of its due date.

In the event this note shall be in default, and placed with an attorney for collection, then the undersigned agree to pay all reasonable attorney fees and costs of collection. Payments not made within five (5) days of due date shall be subject to a late charge of     % of said payment. All payments hereunder shall be made to such address as may from time to time be designated by any holder hereof.

The undersigned and all other parties to this note, whether as endorsers, guarantors or sureties, agree to remain fully bound hereunder until this note shall be fully paid and waive demand, presentment and protest and all notices thereto and further agree to remain bound, notwithstanding any extension, renewal, modification, waiver, or other indulgence by any holder or upon the discharge or release of any obligor hereunder or to this note, or upon the exchange, substitution, or release of any collateral granted as security for this note. No modification or indulgence by any holder hereof shall be binding unless in writing; and any indulgence on any one occasion shall not be an indulgence for any other or future occasion. Any modification or change of terms, hereunder granted by any holder hereof, shall be valid and binding upon each of the undersigned, notwithstanding the acknowledgement of any of the undersigned, and each of the undersigned does hereby irrevocably grant to each of the others a power of attorney to enter into any such modification on their behalf. The rights of any holder hereof shall be cumulative and not necessarily successive. This note shall take effect as a sealed instrument and shall be construed, governed and enforced in accordance with the laws of the State first appearing at the head of this note. The undersigned hereby execute this note as principals and not as sureties.

Signed in the presence of:     CHILLICOTHE CONSTRUCTION CO, INC
                      15 W 154 60TH ST
                      BURR RIDGE, IL 60521

_____     _____
Witness                             Borrower

_____     _____
Witness                             Borrower

## GUARANTY

We the undersigned jointly and severally guaranty the prompt and punctual payment of all monies due under the aforesaid note and agree to remain bound until fully paid.

In the presence of:     CHILLICOTHE CONSTRUCTION CO, INC
                     15 W 154 60TH ST
                     BURR RIDGE, IL. 60521
                     Richard Dempsey - President

_____     _____
Witness                              Borrower

_____     _____
Witness                             Borrower


© E-Z Legal Forms. Before you use this form, read it, fill in all blanks, and make whatever changes are necessary to your particular transaction. Consult a lawyer if you doubt the form's fitness for your purpose and use E-Z L...


EXHIBIT
H
Blumberg No. 5119

NO. 147

PROMISSORY NOTE
(Illinois)

APRIL, 1980

GEORGE E. COLE®
LEGAL FORMS

CAUTION: Consult a lawyer before using or acting under this form. All warranties, including merchantability and fitness, are excluded.

$ _50,000 00_    _FIFTY THOUSAND 00/100_,    _8-24-_    19 _90_

_CHILLICOTHE CONSTRUCTION CO. INC_    after date _8/24/95_ promise to pay to

the order of _HUNTFORT CORPORATION PROFIT SHARING PLAN_

_FIFTY THOUSAND AND_ _____ _00/100_ Dollars

Payable ~~at~~ _AFTER 8·24·95_

Value received with interest at __10__ % per annum.

No. __2__    Due _8/24/91_    _CHILLICOTHE CONSTRUCTION CO INC_
Address __15 W 154 60th St__
_____ _BURR RIDGE ILLINOIS 60521_    _BY Richard Dempsey - TREASURER_

Form A293

# PROMISSORY NOTE

$ 50,000

Dated: *August 24* , 1990

Principal Amount *FIFTY THOUSAND AND 00/100*

State of *ILLINOIS*

FOR VALUE RECEIVED, the undersigned hereby jointly and severally promise to pay to the order of
*KHALSA CORPORATION PROFIT SHARING PLAN*
*(formerly Hunter Clearwood Profit Sharing Plan)* , the sum of *FIFTY THOUSAND*

Dollars ($ *50,000⁰⁰* ), together with interest thereon at the rate of *10* % per
annum on the unpaid balance. Said sum shall be paid in the manner following:

*PRINCIPAL PLUS INTEREST PAYABLE IN FULL on August 24, 2000*

All payments shall be first applied to interest and the balance to principal. This note may be prepaid, at any
time, in whole or in part, without penalty. All prepayments shall be applied in reverse order of maturity.

This note shall at the option of any holder hereof be immediately due and payable upon the failure to make
any payment due hereunder within _____ days of its due date.

In the event this note shall be in default, and placed with an attorney for collection, then the undersigned
agree to pay all reasonable attorney fees and costs of collection. Payments not made within five (5) days of due date
shall be subject to a late charge of _____ % of said payment. All payments hereunder shall be made to
such address as may from time to time be designated by any holder hereof.

The undersigned and all other parties to this note, whether as endorsers, guarantors or sureties, agree to
remain fully bound hereunder until this note shall be fully paid and waive demand, presentment and protest and all
notices thereto and further agree to remain bound, notwithstanding any extension, renewal, modification, waiver, or
other indulgence by any holder or upon the discharge or release of any obligor hereunder or to this note, or upon the
exchange, substitution, or release of any collateral granted as security for this note. No modification or indulgence
by any holder hereof shall be binding unless in writing; and any indulgence on any one occasion shall not be an indul-
gence for any other or future occasion. Any modification or change of terms, hereunder granted by any holder here-
of, shall be valid and binding upon each of the undersigned, notwithstanding the acknowledgment of any of the
undersigned, and each of the undersigned does hereby irrevocably grant to each of the others a power of attorney to
enter into any such modification on their behalf. The rights of any holder hereof shall be cumulative and not neces-
sarily successive. This note shall take effect as a sealed instrument and shall be construed, governed and enforced in
accordance with the laws of the State first appearing at the head of this note. The undersigned hereby execute this
note as principals and not as sureties.

Signed in the presence of:

*CHILLICOTHE CONSTRUCTION COMPANY*
*1515 154 6TH ST*
*BURR RIDGE, IL 60521*
*Richard Dempsey, PRESIDENT*

Witness

X *Richard Dempsey - President*
Borrower

Witness

Borrower

## GUARANTY

We the undersigned jointly and severally guaranty the prompt and punctual payment of all moneys due
under the aforesaid note and agree to remain bound until fully paid. *CHILLICOTHE CONSTRUCTION COMPANY*
*1515 154 60TH ST*
*BURR RIDGE, IL 60521*
*Richard Dempsey, PRESIDENT*

In the presence of:

Witness

X *Richard Dempsey - President*
Guarantor

Witness

Guarantor



© E-Z Legal Forms. Before you use this form, read it, fill in all blanks, and make whatever changes are necessary to your particular
transaction. Consult a lawyer if you doubt the form's fitness for your purpose and use. E-Z Legal Forms and the retailer make no
representation or warranty, express or implied, with respect to the merchantability of this form for an intended use or purpose.
(Revised 1/93)

3926 20293



EXHIBIT
I

Blumberg No. 5119

*# 3*

Form A293

## PROMISSORY NOTE

$ *100,000 ⁰⁰ AND 00/100*                Dated: *DECEMBER 18, 19 90*

Principal Amount *ONE HUNDRED THOUSAND* State of *ILLINOIS*
*AND 00/100*

FOR VALUE RECEIVED, the undersigned hereby jointly and severally promise to pay to the order of *KHALSA CORPORATION PROFIT SHARING PLAN* ~~$100,000⁰⁰~~
*(FORMERLY HUNTORT CORPORATION PROFIT SHARING PLAN)*

Dollars ($ *100,000 ⁰⁰ AND 00/100*                ), together with interest thereon at the rate of *10* %
per annum on the unpaid balance. Said sum shall be paid in the manner following:

*PRINCIPAL AND INTEREST PAYABLE IN FULL ON 12/18/95*

All payments shall be first applied to interest and the balance to principal. This note may be prepaid, at any time, in whole or in part, without penalty. All prepayments shall be applied in reverse order of maturity.

This note shall at the option of any holder hereof be immediately due and payable upon the failure to make any payment due hereunder within

In the event this note shall be in default, and placed with an attorney for collection, then the undersigned agree to pay all reasonable attorney fees and costs of collection. Payments not made within five (5) days of due date shall be subject to a late charge of            % of said payment. All payments hereunder shall be made to such address as may from time to time be designated by any holder hereof.

The undersigned and all other parties to this note, whether as endorsers, guarantors or sureties, agree to remain fully bound hereunder until this note shall be fully paid and further agree to remain bound, notwithstanding any demand, presentment and protest and all notices thereto and further agree to remain bound, notwithstanding any extension, renewal, modification, waiver, or other indulgence by any holder or upon the discharge or release of any obligor hereunder or to this note, or upon the exchange, substitution, or release of any collateral granted as security for this note. No modification or indulgence by any holder hereof shall be binding unless in writing; and any indulgence on any one occasion shall not be an indulgence for any other or future occasion. Any modification or change of terms, hereunder granted by any holder hereof, shall be valid and binding upon each of the undersigned, notwithstanding the acknowledgement of any of the undersigned, and each of the undersigned does hereby irrevocably grant to each of the others a power of attorney to enter into any such modification on their behalf. The rights of any holder hereof shall be cumulative and not necessarily successive. This note shall take effect as a sealed instrument and shall be construed, governed and enforced in accordance with the laws of the State first appearing at the head of this note. The undersigned hereby execute this note as principals and not as sureties.

Signed in the presence of:                *CHILLICOTHE CONSTRUCTION CO, INC.*
                                          *15 W 154 60TH ST*
                                          *BURR RIDGE, IL 60521*

_____                  _____
Witness                                  Borrower

_____                  _____
Witness                                  Borrower

## GUARANTY

We the undersigned jointly and severally guaranty the prompt and punctual payment of all monies due under the aforesaid note and agree to remain bound until fully paid.

In the presence of:                      *CHILLICOTHE CONSTRUCTION CO, INC.*
                                         *15 W 154 60TH ST*
*Deg. McClusg*                           *Burr Ridge, IL 60521*
_____                  *Richard Sempry - President*
Witness                                  _____
                                         Borrower

_____                  _____
Witness                                  Borrower

© E-Z Legal Forms. Before you use this form, read it, fill in all blanks, and make whatever changes are necessary to your particular transaction. Consult a lawyer if you doubt the form's fitness for your purpose and use. E-Z Legal Forms and the retailer make no representation or warranty, express or implied, with respect to the merchantability or fitness of this form for an intended use or purpose.



EXHIBIT
**J**

GEORGE E. COLE®
LEGAL FORMS

PROMISSORY NOTE
(Illinois)
NO. 1447
Rev. 1980

CAUTION: Consult a lawyer before using or acting under this form. All warranties, including merchantability and fitness, are excluded.

$ 100,000 00    ONE HUNDRED THOUSAND 00/100,    12-18    19 90

CHILLICOTHE CONSTRUCTION CO. IN    after date 12/18/9x promise to pay to

the order of HUNTFORT PROFIT SHARING PLAN

ONE HUNDRED THOUSAND AND    00/100 Dollars

Payable at AFTER 12-18-95

Value received with interest at 10 % per annum.

No. 3    Due 12-18-95    CHILLICOTHE CONSTRUCTION CO INC
Address 15 W 154 60th ST
BURR RIDGE ILLINOIS 60521    BY Richard Dempsey - TREASURER

Form A293

# PROMISSORY NOTE

$ 100,000 00

Dated: _December 18_ , 19 90

Principal Amount _ONE HUNDRED THOUSAND_ State of _Illinois_
_AND 00/100_

FOR VALUE RECEIVED, the undersigned hereby jointly and severally promise to pay to the order of
_KAHSA CORPORATION PROFIT SHARING PLAN_ ~~————~~
(_FORMERLY HUNTROT CORPORATION PROFIT SHARING PLAN_) , the sum of
Dollars ($ _100,000 00_ ), together with interest thereon at the rate of _10_ % per
annum on the unpaid balance. Said sum shall be paid in the manner following:

_PRINCIPLE AND INTEREST   PAYABLE IN FULL ON 12/18/00_

All payments shall be first applied to interest and the balance to principal. This note may be prepaid, at any time, in whole or in part, without penalty. All prepayments shall be applied in reverse order of maturity.

This note shall at the option of any holder hereof be immediately due and payable upon the failure to make any payment due hereunder within _____ days of its due date.

In the event this note shall be in default, and placed with an attorney for collection, then the undersigned agree to pay all reasonable attorney fees and costs of collection. Payments not made within five (5) days of due date shall be subject to a late charge of _____ % of said payment. All payments hereunder shall be made to such address as may from time to time be designated by any holder hereof.

The undersigned and all other parties to this note, whether as endorsers, guarantors or sureties, agree to remain fully bound hereunder until this note shall be fully paid and waive demand, presentment and protest and all notices thereto and further agree to remain bound, notwithstanding any extension, renewal, modification, waiver, or other indulgence by any holder or upon the discharge or release of any obligor hereunder or to this note, or upon the exchange, substitution, or release of any collateral granted as security for this note. No modification or indulgence by any holder hereof shall be binding unless in writing; and any indulgence on any one occasion shall not be an indulgence for any other or future occasion. Any modification or change of terms, hereunder granted by any holder hereof, shall be valid and binding upon each of the undersigned, notwithstanding the acknowledgment of any of the undersigned, and each of the undersigned does hereby irrevocably grant to each of the others a power of attorney to enter into any such modification on their behalf. The rights of any holder hereof shall be cumulative and not necessarily successive. This note shall take effect as a sealed instrument and shall be construed, governed and enforced in accordance with the laws of the State first appearing at the head of this note. The undersigned hereby execute this note as principals and not as sureties.

Signed in the presence of:

_CHILLICOTHE CONSTRUCTION COMPANY_
_15 W 54TH ST._
_BULL ROSE, IL 60521_
_RICHARD DEMPSEY, PRESIDENT_

Witness _L. J. McClerg_

X _Richard Dempsey — President_
Borrower

_____
Witness

_____
Borrower

## GUARANTY

We the undersigned jointly and severally guaranty the prompt and punctual payment of all moneys due under the aforesaid note and agree to remain bound until fully paid.

In the presence of:

_CHILLICOTHE CONSTRUCTION COMPANY_
_15 W 154 60TH ST._
_BULL ROSE, IL   60521_
_RICHARD DEMPSEY, PRESIDENT_

Witness _L. J. McClerg_

X _Richard Dempsey — President_
Guarantor

_____
Witness

_____
Guarantor

© E-Z Legal Forms. Before you use this form, read it, fill in all blanks, and make whatever changes are necessary to your particular transaction. Consult a lawyer if you doubt the form's fitness for your purpose and use. E-Z Legal Forms and the retailer make no representation or warranty, express or implied, with respect to the merchantability of this form for an intended use or purpose.
(Revised 1/93)

Blumberg No. 5119

EXHIBIT
K

3926 20293   5

Form A293

# PROMISSORY NOTE

$ *125,000 =*

Dated: *JANUARY 2* , 19 *91*

Principal Amount *ONE HUNDRED AND*   State of *ILLINOIS*
*TWENTY FIVE THOUSAND AND 00/100*
, the sum of

FOR VALUE RECEIVED, the undersigned hereby jointly and severally promise to pay to the
order of *KHALSA CORPORATION PROFIT SHARING PLAN* ~~(B-103073)~~
*(formerly HUNT-POET CORPORATION PROFIT SHARING PLAN )*

Dollars ($ *125,000 AND 00/100* ), together with interest thereon at the rate of *10* %
per annum on the unpaid balance. Said sum shall be paid in the manner following:

*PRINCIPAL AND INTEREST PAYABLE IN FULL ON 01/02/96*

    All payments shall be first applied to interest and the balance to principal. This note may be
prepaid, at any time, in whole or in part, without penalty. All prepayments shall be applied in reverse order
of maturity.

    This note shall at the option of any holder hereof be immediately due and payable upon the failure to
make any payment due hereunder within _____ days of its due date.

    In the event this note shall be in default, and placed with an attorney for collection, then the
undersigned agree to pay all reasonable attorney fees and costs of collection. Payments not made within five
(5) days of due date shall be subject to a late charge of _____ % of said payment. All payments
hereunder shall be made to such address as may from time to time be designated by any holder hereof.

    The undersigned and all other parties to this note, whether as endorsers, guarantors or sureties, agree
to remain fully bound hereunder until this note shall be fully paid and waive demand, presentment and protest
and all notices thereto and further agree to remain bound, notwithstanding any extension, renewal,
modification, waiver, or other indulgence by any holder or upon the discharge or release of any obligor
hereunder or to this note, or upon the exchange, substitution, or release of any collateral granted as security
for this note. No modification or indulgence by any holder hereof shall be binding unless in writing; and any
indulgence on any one occasion shall not be an indulgence for any other or future occasion. Any modification
or change of terms, hereunder granted by any holder hereof, shall be valid and binding upon each of the
undersigned, notwithstanding the acknowledgement of any of the undersigned, and each of the undersigned does
hereby irrevocably grant to each of the others a power of attorney to enter into any such modification on their
behalf. The rights of any holder hereof shall be cumulative and not necessarily successive. This note shall
take effect as a sealed instrument and shall be construed, governed and enforced in accordance with the laws of
the State first appearing at the head of this note. The undersigned hereby execute this note as principals and
not as sureties.

Signed in the presence of:

*CHILLICOTHE CONSTRUCTION CO, INC*
*15 W 154 60TH ST*
*BURR RIDGE, IL 60521*

_____     _____
Witness                                      Borrower

_____     _____
Witness                                      Borrower

## GUARANTY

    We, the undersigned jointly and severally guaranty the prompt and punctual payment of all monies
due under the aforesaid note and agree to remain bound until fully paid.

In the presence of: -

*CHILLICOTHE CONSTRUCTION CO, INC*
*15 W 154 60TH ST*
*BURR RIDGE, IL 60521*

_____*Gez McCaul*_____     _____*Richard Dempsey - Treasurer*_____
Witness                                      Borrower

_____     _____
Witness                                      Borrower



© E-Z Legal Forms. Before you use this form, read it, fill in all blanks, and make whatever changes are necessary
to your particular transaction. Consult a lawyer if you doubt the form's fitness for your purpose and use. E-Z Legal
Forms and the retailer make no representation or warranty, express or implied, with respect to the merchantability of
this form for an intended use or purpose.

(Revised 3/93)



EXHIBIT
L

PROMISSORY NOTE
(Illinois)

GEORGE E. COLE®
LEGAL FORMS

APRIL, 1960

CAUTION: Consult a lawyer before using or acting under this form. All warranties, including merchantability and fitness, are excluded.

$ _125,000 00_    ONE HUNDRED & TWENTY FIVE THOUSAND 00/100    1-2    19 91

CHILLICOTHE CONSTRUCTION CO. INC _____ after date 1/2/96 promise to pay to

the order of _HUNTFORT CORPORATION PROFIT SHARING PLAN_

_ONE HUNDRED AND TWENTY FIVE THOUSAND_ 00/100 Dollars

Payable at _AFTER 1-2-96_

Value received with interest at _10_ % per annum.

No. _4_ ____ Due _1-2-96_ _____ CHILLICOTHE CONSTRUCTION CO. INC

Address _15 W 154 60th St_

_BURR RIDGE ILLINOIS 60521_    By Richard Dempsey - TREASURER

Form A293

# PROMISSORY NOTE

$ *125,000*

Dated: *JANUARY 2* , 19*91*

Principal Amount *ONE HUNDRED*
*TWENTY FIVE THOUSAND AND 00/100*
State of *ILLINOIS*

FOR VALUE RECEIVED, the undersigned hereby jointly and severally promise to pay to the order of
*KHALSA CORPORATION PROFIT SHARING PLAN* ~~[redacted]~~
*(KENNELLY HUNT FORT CORPORATION PROFIT SHARING PLAN)* the sum of

Dollars ($ *125,000 ²²* ), together with interest thereon at the rate of *10 %* per
annum on the unpaid balance. Said sum shall be paid in the manner following:

*PRINCIPLE AND INTEREST PAYABLE IN FULL ON*
*JANUARY 2, 2001*

All payments shall be first applied to interest and the balance to principal. This note may be prepaid, at any time, in whole or in part, without penalty. All prepayments shall be applied in reverse order of maturity.

This note shall at the option of any holder hereof be immediately due and payable upon the failure to make any payment due hereunder within _____ days of its due date.

In the event this note shall be in default, and placed with an attorney for collection, then the undersigned agree to pay all reasonable attorney fees and costs of collection. Payments not made within five (5) days of due date shall be subject to a late charge of _____ % of said payment. All payments hereunder shall be made to such address as may from time to time be designated by any holder hereof.

The undersigned and all other parties to this note, whether as endorsers, guarantors or sureties, agree to remain fully bound hereunder until this note shall be fully paid and waive demand, presentment and protest and all notices thereto and further agree to remain bound, notwithstanding any extension, renewal, modification, waiver, or other indulgence by any holder or upon the discharge or release of any obligor hereunder or to this note, or upon the exchange, substitution, or release of any collateral granted as security for this note. No modification or indulgence by any holder hereof shall be binding unless in writing; and any indulgence on any one occasion shall not be an indulgence for any other or future occasion. Any modification or change of terms, hereunder granted by any holder hereof, shall be valid and binding upon each of the undersigned, notwithstanding the acknowledgment of any of the undersigned, and each of the undersigned does hereby irrevocably grant to each of the others a power of attorney to enter into any such modification on their behalf. The rights of any holder hereof shall take effect as a sealed instrument and shall be construed, governed and enforced in accordance with the laws of the State first appearing at the head of this note. The undersigned hereby execute this note as principals and not as sureties.

Signed in the presence of:

*CHILLICOTHE CONSTRUCTION COMPANY*
*15 W 154 60 W ST*
*BARE EDSE, IL 60521*
*RICHARD DEMPSEY, PRESIDENT*

Witness _*[signature]*_

X _*Richard Dempsey - President*_
Borrower

Witness _____

_____
Borrower

## GUARANTY

We the undersigned jointly and severally guaranty the prompt and punctual payment of all moneys due under the aforesaid note and agree to remain bound until fully paid. *CHILLICOTHE CONSTRUCTION COMPANY*
*15 W 154 60 W ST*
*BARE EDSE, IL 60521*
*RICHARD DEMPSEY, PRESIDENT*

In the presence of:

Witness _*[signature]*_

X _*Richard Dempsey - President*_
Guarantor

Witness _____

_____
Guarantor

© E-Z Legal Forms. Before you use this form, read it, fill in all blanks, and make whatever changes are necessary to your particular transaction. Consult a lawyer if you doubt the form's fitness for your purpose and use. E-Z Legal Forms and the retailer make no representation or warranty, express or implied, with respect to the merchantibility of this form for an intended use or purpose.

(Revised 1/95)


53926 20293 5

EXHIBIT
M

Blumberg No. 5119

Form A293

# PROMISSORY NOTE

$500,000°° AND 00/100          Dated:        MARCH 1    , 19 91

Principal Amount *FIVE HUNDRED THOUSAND*    State of    *ILLINOIS*
AND 00/100

FOR VALUE RECEIVED, the undersigned hereby jointly and severally promise to pay to the order of *KHALSA CORPORATION PROFIT SHARING PLAN* ~~IS TRUST~~
(*formerly HUNTFORD CORPORATION PROFIT SHARING PLAN*)
, the sum of

Dollars ($ *500,000 AND 00/100*              ), together with interest thereon at the rate of  *10* %
per annum on the unpaid balance. Said sum shall be paid in the manner following:

*PRINCIPAL AND INTEREST PAYABLE IN FULL ON  03/01/96*

All payments shall be first applied to interest and the balance to principal. This note may be prepaid, at any time, in whole or in part, without penalty. All prepayments shall be applied in reverse order of maturity.

This note shall at the option of any holder hereof be immediately due and payable upon the failure to make any payment due hereunder within _____ days of its due date.

In the event this note shall be in default, and placed with an attorney for collection, then the undersigned agree to pay all reasonable attorney fees and costs of collection. Payments not made within five (5) days of due date shall be subject to a late charge of _____ % of said payment. All payments hereunder shall be made to such address as may from time to time be designated by any holder hereof.

The undersigned and all other parties to this note, whether as endorsers, guarantors or sureties, agree to remain fully bound hereunder until this note shall be fully paid and waive demand, presentment and protest and all notices thereto and further agree to remain bound, notwithstanding any extension, renewal, modification, waiver, or other indulgence by any holder or upon the discharge or release of any obligor hereunder or to this note, or upon the exchange, substitution, or release of any collateral granted as security for this note. No modification or indulgence by any holder hereof shall be binding unless in writing; and any indulgence on any one occasion shall not be an indulgence for any other or future occasion. Any modification or change of terms, hereunder granted by any holder hereof, shall be valid and binding upon each of the undersigned, notwithstanding the acknowledgement of any of the undersigned, and each of the undersigned does hereby irrevocably grant to each of the others a power of attorney to enter into any such modification on their behalf. The rights of any holder hereof shall be cumulative and not necessarily successive. This note shall take effect as a sealed instrument and shall be construed, governed and enforced in accordance with the laws of the State first appearing at the head of this note. The undersigned hereby execute this note as principals and not as sureties.

Signed in the presence of:                 *CHILLICOTHE CONSTRUCTION CO, INC*
                                           *15 W 154  60TH ST*
                                           *PARK RIDGE, IL 60521*

_____          _____
Witness                          Borrower

_____          _____
Witness                          Borrower

## GUARANTY

We the undersigned jointly and severally guaranty the prompt and punctual payment of all monies due under the aforesaid note and agree to remain bound until fully paid.

In the presence of:                        *CHILLICOTHE CONSTRUCTION CO, INC*
                                           *15 W 154 60TH ST.*
                                           *PARK RIDGE, IL 60521*

_____          _____
Witness                          Borrower  *Richard Shaughney - Treasurer*

_____          _____
Witness                          Borrower

© E-Z Legal Forms. Before you use this form, read it, fill in all blanks, and make whatever changes are necessary to your particular transaction. Consult a lawyer if you doubt the form's fitness for your purpose and use. E-Z Legal Forms and the retailer make no representation or warranty, express or implied, with respect to the merchantability of this form for an intended use or purpose.
(Revised 3/93)


EXHIBIT
N
Blumberg No. 5119

PROMISSORY NOTE
(Illinois)

GEORGE E. COLE®
LEGAL FORMS

No. 147
SPFL. 1980

CAUTION: Consult a lawyer before using or acting under this form. All warranties, including merchantability and fitness, are excluded.

$ 500,000 00   FIVE HUNDRED THOUSAND 00/100,   3-1   19 91

CHILLICOTHE CONSTRUCTION CO. INC   after date 3/1/96 promise to pay to

the order of HUNTFORT CORPORATION PROFIT SHARING PLAN

FIVE HUNDRED THOUSAND AND   00/100   Dollars

Payable at AFTER 3-1-96

Value received with interest at 10 % per annum.

No. 5   Due 3-1-96   CHILLICOTHE CONSTRUCTION CO. INC
Address 15 W 154 60th ST
BURR RIDGE ILL 60521   BY Richard Demprey - TREASURER

Form A293

# PROMISSORY NOTE

$ *500,000 and 00/100*          Dated: *MARCH 1*          , 19*91*

Principal Amount *FIVE HUNDRED*          State of *ILLINOIS*
*THOUSAND AND 00/100*

FOR VALUE RECEIVED, the undersigned hereby jointly and severally promise to pay to the order of
*KHALSA CORPORATION PROFIT SHARING PLAN* ~~...~~
*(formerly HUNTKOT CORPORATION PROFIT SHARING PLAN)*
, the sum of

Dollars ($ *500,000 and 00/100*          ), together with interest thereon at the rate of *10* % per
annum on the unpaid balance. Said sum shall be paid in the manner following:

*PRINCIPAL AND INTEREST PAYABLE IN FULL ON 03/01/2001*

All payments shall be first applied to interest and the balance to principal. This note may be prepaid, at any
time, in whole or in part, without penalty. All prepayments shall be applied in reverse order of maturity.

This note shall at the option of any holder hereof be immediately due and payable upon the failure to make
any payment due hereunder within ___ days of its due date.

In the event this note shall be in default, and placed with an attorney for collection, then the undersigned
agree to pay all reasonable attorney fees and costs of collection. Payments not made within five (5) days of due date
shall be subject to a late charge of ___ % of said payment. All payments hereunder shall be made to
such address as may from time to time be designated by any holder hereof.

The undersigned and all other parties to this note, whether as endorsers, guarantors or sureties, agree to
remain fully bound hereunder until this note shall be fully paid and waive demand, presentment and protest and all
notices thereto and further agree to remain bound, notwithstanding any extension, renewal, modification, waiver, or
other indulgence by any holder or upon the discharge or release of any obligor hereunder or to this note, or upon the
exchange, substitution, or release of any collateral granted as security for this note. No modification or indulgence
by any holder hereof shall be binding unless in writing; and any indulgence on any one occasion shall not be an indul-
gence for any other or future occasion. Any modification or change of terms, hereunder granted by any holder here-
of, shall be valid and binding upon each of the undersigned, notwithstanding the acknowledgment of any of the
undersigned, and each of the undersigned does hereby irrevocably grant to each of the others a power of attorney to
enter into any such modification on their behalf. The rights of any holder hereof shall be cumulative and not neces-
sarily successive. This note shall take effect as a sealed instrument and shall be construed, governed and enforced in
accordance with the laws of the State first appearing at the head of this note. The undersigned hereby execute this
note as principals and not as sureties.

Signed in the presence of:                              *CHILLICOTHE CONSTRUCTION, INC*
                                                        *15 W 154 60TH ST*
_____                        *BULL [...] IL 60521*
Witness                                                 X *Richard Dempsey - President*
                                                          Borrower

_____                        _____
Witness                                                 Borrower

## GUARANTY

We the undersigned jointly and severally guaranty the prompt and punctual payment of all moneys due
under the aforesaid note and agree to remain bound until fully paid.

In the presence of:                                     *CHILLICOTHE CONSTRUCTION CO, INC*
                                                        *15 W 154 60th ST*
_____                        *BULL [...] IL 60521*
Witness                                                 X *Richard Dempsey - President*
                                                          Guarantor

_____                        _____
Witness                                                 Guarantor

© E-Z Legal Forms. Before you use this form, read it, fill in all blanks, and make whatever changes are necessary to your particular
transaction. Consult a lawyer if you doubt the form's fitness for your purpose and use. E-Z Legal Forms and the retailer make no
representation or warranty, express or implied, with respect to the merchantability of this form for an intended use or purpose.
(Revised 1/95)

53926 20293 5

Blumberg No. 5119

EXHIBIT
O

#6

Form  A293

## PROMISSORY NOTE

$*400,000* AND 00/100                    Dated:      *MAY 15* , 19 *92*

Principal Amount *four Hundred Thousand* State of *ILLINOIS*
*AND 00/100*

FOR VALUE RECEIVED, the undersigned hereby jointly and severally promise to pay to the
order of *HANSEN CORPORATION PROFIT SHARING PLAN* ~~~~~~~~~~~~
*(formerly HANSFORD CORPORATION PROFIT SHARING PLAN)*
, the sum of

Dollars (S *400,000 AND 00/100*                ), together with interest thereon at the rate of        %
per annum on the unpaid balance.  Said sum shall be paid in the manner following:

*PRINCIPAL AND INTEREST PAYABLE IN FULL ON 05/15/97*

All payments shall be first applied to interest and the balance to principal.  This note may be
prepaid, at any time, in whole or in part, without penalty.  All prepayments shall be applied in reverse order
of maturity.

This note shall at the option of any holder hereof be immediately due and payable upon the failure to
make any payment due hereunder within                    days of its due date.

In the event this note shall be in default, and placed with an attorney for collection, then the
undersigned agree to pay all reasonable attorney fees and costs of collection.  Payments not made with.n five
(5) days of due date shall be subject to a late charge of            % of said payment.  All payments
hereunder shall be made to such address as may from time to time be designated by any holder hereof.

The undersigned and all other parties to this note, whether as endorsers, guarantors or sureties, agree
to remain fully bound hereunder until this note shall be fully paid and waive demand, presentment and protest
and all notices thereto and further agree to remain bound, notwithstanding any extension, renewal,
modification, waiver, or other indulgence by any holder or upon the discharge or release of any obligor
hereunder or to this note, or upon the exchange, substitution, or release of any collateral granted as security
for this note.  No modification or indulgence by any holder hereof shall be binding unless in writing; and any
indulgence on any one occasion shall not be an indulgence for any other or future occasion.  Any modification
or change of terms, hereunder granted by any holder hereof, shall be valid and binding upon each of the
undersigned, notwithstanding the acknowledgement of any of the undersigned, and each of the undersigned does
hereby irrevocably grant to each of the others a power of attorney to enter into any such modification on their
behalf.  The rights of any holder hereof shall be cumulative and not necessarily successive.  This note shall
take effect as a sealed instrument and shall be construed, governed and enforced in accordance with the laws of
the State first appearing at the head of this note.  The undersigned hereby execute this note as principals and
not as sureties.

Signed in the presence of:                     *CHILLICOTHE CONSTRUCTION CO, INC*
                                               *15 W 154 60TH ST*
                                               *BURR RIDGE, IL 60521*

_____               _____
Witness                                        Borrower

_____               _____
Witness                                        Borrower

### GUARANTY

We the undersigned jointly and severally guaranty the prompt and punctual payment of all monies
due under the aforesaid note and agree to remain bound until fully paid.

In the presence of:                            *CHILLICOTHE CONSTRUCTION CO, INC.*
                                               *15 W 154 60TH ST.*
                                               *BURR RIDGE IL. 6052*
_____               _____
Witness                                        Borrower *Richard Tempsey, Treasurer*

_____               _____
Witness                                        Borrower

© E-Z Legal Forms. Before you use this form, read it, fill in all blanks, and make whatever changes are necessary
to your particular transaction.  Consult a lawyer if you doubt the form's fitness for your purpose and use.  E-Z Legal
Forms and the retailer make no representation or warranty, express or implied, with respect to the merchantability of
this form for an intended use or purpose.
(Revised 3/93)



EXHIBIT
P

Blumberg No. 5119

PROMISSORY NOTE
(Illinois)

GEORGE E. COLE®
LEGAL FORMS

CAUTION: Consult a lawyer before using or acting under this form. All warranties, including merchantability and fitness, are excluded.

$ 400,000 00   Four Hundred Thousand ,   5-15   19 92

CHILLICOTHE CONSTRUCTION CO. INC   after date 5/15/92 promise to pay to

the order of HUNTFORT CORPORATION PROFIT SHARING PLAN

FOUR HUNDRED THOUSAND AND   00/100 Dollars

Payable at AFTER 5-15-92

Value received with interest at 10 % per annum.

No. 6   Due   CHILLICOTHE CONSTRUCTION CO. INC
Address 15 W 154 60 th ST
BURR RIDGE ILLINOIS 60521   BY Richard Dempsey - TREASURER

A 293

# PROMISSORY NOTE

$ *400,000 and 00/100*

Principal Amount *four Hundred Thousand and 00/100*

Dated: *MAY 15* , 19 *92*

State of *ILLINOIS*

FOR VALUE RECEIVED, the undersigned hereby jointly and severally promise to pay to the order of *KHASA CORPORATION PROFIT SHARING PLAN* *(Formerly Kentbet Corporation Profit Sharing Plan)* , the sum of

Dollars ($ *400,000 and 00/100* ), together with interest thereon at the rate of *10 %* per annum on the unpaid balance. Said sum shall be paid in the manner following:

*Principal and Interest payable in full on 05/15/2002*

All payments shall be first applied to interest and the balance to principal. This note may be prepaid, at any time, in whole or in part, without penalty. All prepayments shall be applied in reverse order of maturity.

This note shall at the option of any holder hereof be immediately due and payable upon the failure to make any payment due hereunder within                                        days of its due date.

In the event this note shall be in default, and placed with an attorney for collection, then the undersigned agree to pay all reasonable attorney fees and costs of collection. Payments not made within five (5) days of due date shall be subject to a late charge of                  % of said payment. All payments hereunder shall be made to such address as may from time to time be designated by any holder hereof.

The undersigned and all other parties to this note, whether as endorsers, guarantors or sureties, agree to remain fully bound hereunder until this note shall be fully paid and waive demand, presentment and protest and all notices thereto and further agree to remain bound, notwithstanding any extension, renewal, modification, waiver, or other indulgence by any holder or upon the discharge or release of any obligor hereunder or to this note, or upon the exchange, substitution, or release of any collateral granted as security for this note. No modification or indulgence by any holder hereof shall be binding unless in writing; and any indulgence on any one occasion shall not be a indulgence for any other or future occasion. Any modification or change of terms, hereunder granted by any holder hereof, shall be valid and binding upon each of the undersigned, notwithstanding the acknowledgment of any of the undersigned, and each of the undersigned does hereby irrevocably grant to each of the others a power of attorney to enter into any such modification on their behalf. The rights of any holder hereof shall be cumulative and not necessarily successive. This note shall take effect as a sealed instrument and shall be construed, governed and enforced in accordance with the laws of the State first appearing at the head of this note. The undersigned hereby execute this note as principals and not as sureties.

Signed in the presence of:

Witness _____

Witness _____

*CHILLICOTHE CONSTRUCTION CO INC*
*15 W 154 COT ST*
*BUFF 2 OGC IL 60521*

X _____
Borrower   *Richard Dempsey - President*

_____
Borrower

## GUARANTY

We the undersigned jointly and severally guaranty the prompt and punctual payment of all moneys due under the aforesaid note and agree to remain bound until fully paid.

In the presence of:

Witness _____

Witness _____

*CHILLICOTHE CONSTRUCTION CO INC*
*15 W 154 COT ST*
*BOFE 2 OGEN IL 60521*

X _____
Guarantor   *Richard Dempsey - President*

_____
Guarantor

© E-Z Legal Forms. Before you use this form, read it, fill in all blanks, and make whatever changes are necessary to your particular transaction. Consult a lawyer if you doubt the form's fitness for your purpose and use. E-Z Legal Forms and the retailer make no representation or warranty, express or implied, with respect to the merchantability of this form for an intended use or purpose.

(Revised 1/85)

53926 20293 5



EXHIBIT
Q2

Blumberg No. 5119

ORDER - BLANK                                                                    2116 (Rev. 10/05)

| STATE OF ILLINOIS | UNITED STATES OF AMERICA | COUNTY OF DU PAGE |
|---|---|---|

**IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT**

George J. McCarthy

PLAINTIFF

VS.

Chillicothe Construction Co., Inc.
and
Richard Dempsey

DEFENDANT

**CASE NUMBER**

**00 L 933**

FILED

2008 JAN 11 PM 3: 51

CLERK OF THE
18TH JUDICIAL CIRCUIT
DU PAGE COUNTY, ILLINOIS

File Stamp Here

**ORDER**

This matter coming on to be heard, the Court being fully advised in the premises and having jurisdiction of the subject matter, **IT IS HEREBY ORDERED:**

Judgment is entered in favor of the Plaintiff, George J. McCarthy, for $2,500,000.00 as follows:

1) Counts I - VI against Chillicothe Construction Company, Inc. of the Third Amended verified complaint.

2) Count VII against Richard Dempsey of the Third Amended Complaint

3) All parties waive their right to appeal.

**CERTIFICATION**

I, Chris Kachiroubas, Clerk of the 18th Judicial Circuit Court, DuPage County, Illinois, do hereby certify this to be a true and correct copy as it appears from the records and files in my office. IN WITNESS WHEREOF, I have hereunto set my hand and caused to be affixed the Seal of the said Court.

DATE JAN 11 2008

CHRIS KACHIROUBAS, Clerk

By _____ Deputy Clerk

118

*Richard Dempsey*

*Geg McCoy*

| Name: | John N. Bielski, II | ☐ PRO SE |
|---|---|---|
| DuPage Attorney Number: | 27846 | |
| Attorney for: | Plaintiff | |
| Address: | 166 W. Washington, #300 | |
| City/State/Zip: | Chicago, IL 60602 | |
| Telephone: | 312-334-3445 | |

ENTER:

_John T._____
Judge

Date: 1-11-08

EXHIBIT
R

**CHRIS KACHIROUBAS, CLERK OF THE 18TH JUDICIAL CIRCUIT COURT ©**